Harry Kenneth KRABBE,
et al., Appellants,

v.

ANADARKO PETROLEUM
CORPORATION,
Appellee.

No. 07–99–0456–CV.

Court of Appeals of Texas,
Amarillo.

Feb. 15, 2001.

Lovell & Lyle, P.C., James R. Lovell, Dumas, Lovell, Lovell & Newsom, L.L.P., Joe L. Lovell, Amarillo, for appellants.

Anadarko Petroleum Corporation, J. Kyle McClain, Houston, Sprouse, Smith & Rowley, P.C., Harlow Sprouse, Marty Rowley, Kirk Crutcher, Charles Miller, Amarillo, for appellee.

Before QUINN and REAVIS and JOHNSON, JJ.

JOHNSON, Justice.

Appellants Harry Kenneth Krabbe and others [1] (collectively, Krabbe), as oil and gas lessors, sued appellee Anadarko Petroleum Corporation (Anadarko), lessee, for a declaratory judgment that the lease terminated due to two periods of time during which production ceased. The trial court entered judgment declaring the lease valid and awarded Anadarko attorneys' fees. Appellants contend that the trial court erred by (1) finding that the two periods of cessation in production were excused under the temporary cessation of production doctrine; and (2) awarding attorneys' fees to Anadarko. We affirm.

## BACKGROUND

In May, 1926, Montie Rockwell and her husband executed an oil and gas lease on the west half of the south half of Section 102, Block 46, H & TC Ry. Co. Survey, in Potter County, Texas, to John P. Mathis. In May, 1930, the Rockwells leased the east half of the south half of section 102 to Mathis. Both leases contained the following habendum clause language:

It is agreed that this lease shall remain in force for a term of five years from this date, and as long thereafter as oil or gas, or either of them is produced from said land by the lessee.

The leases did not contain a shut-in clause, a cessation of production clause, or any other savings provision.

By agreement dated April 30, 1935, the two leases were consolidated. The consolidation agreement provided in part that:

... [e]ach of said two leases covering the said 320 acre tract of land shall remain in full force and effect for a term of so long as natural gas is produced from said well or so long as oil or natural gas is produced from any additional well or wells which lessee, its successors or assigns, may hereafter drill and complete upon the said 320 acre tract.

After a series of conveyances, Anadarko acquired the consolidated lease.

Two wells maintained the lease. The Rockwell 1–102 was the first well drilled on the lease, and it was completed in 1931 in the Brown Dolomite formation. Production from this well maintained the lease into the secondary term. A second well, the Rockwell B1R, was completed in 1961 in the Red Cave formation.

During the relevant time frames at issue, 1985 and 1986, gas produced from these two wells was sold to Cabot Corporation (Cabot) after passing through meters close to the wellhead. The gas was gathered and transported to Cabot's Turkey Creek processing plant through separate pipelines. The B1R gas was transported through the Masterson Loop line, which was controlled by Westar Transmission Company and later by Cabot. Gas from 1–102 was transported through the Panhandle 10–inch line, which was leased from Panhandle Eastern Pipeline Company (PEPL) by Pioneer Corporation and later by Cabot. PEPL, Anadarko's predecessor

1. Appellants are Harry Kenneth Krabbe, Donald Dean Krabbe, Mrs. Montye G. Keeter, and Betty J. Rockwell, Trustee of the Betty J. Rockwell Trust.

in interest, and Anadarko were corporate subsidiaries of Panhandle Eastern Corporation, a holding company, during the time periods in question.

Gas from B1R and 1–102 was sold under separate contracts in order to separate the types of gas produced. The 1–102 produced what was called "old" gas under federal guidelines, while the B1R produced what was referred to as "new" gas. Westar, then later Cabot, purchased the B1R "new" gas. In 1964, Pioneer/Westar [2] entered into a contract with Panhandle Eastern Exploration Company (PEEC) to purchase "old" gas from the Brown Dolomite wells, including 1–102.

The 1964 gas contract had a 20–year term. In 1984, Cabot acquired Pioneer's rights under both the 1964 gas contract and an agreement whereby Pioneer leased the Panhandle 10–inch gathering and transportation line from PEPL.

Both the 1964 "old" gas contract between PEEC and Westar, and the lease for the Panhandle 10–inch line between PEPL and Pioneer came up for redetermination in 1984. Contract negotiations extended beyond the July 14, 1984, expiration date. In September, 1984, representatives of PEEC and Westar agreed to new pricing terms on the Brown Dolomite wells. Subsequently, Westar advised PEEC that Cabot was purchasing Westar's assets and taking over its contracts. PEEC thereupon attempted to confirm the gas price negotiated with Westar and confirm extension of the 1964 gas contract. Cabot did not approve the price and extension terms previously agreed to between PEEC and Westar.

Although the 1964 contract had arguably expired, Cabot continued to take gas from the Brown Dolomite wells, which included 1–102, through the Panhandle 10–inch line.

The parties continued negotiations concerning a new gas price, but negotiations were unsuccessful. For a period of 19 months, from May 17, 1985, until January, 1987, gas was not produced from 1–102. On December 31, 1985, PEEC filed suit against Cabot, alleging that the 1964 gas contract had been extended with a price redetermination. The parties settled in January, 1987, and production from 1–102 resumed.

Although the 1–102 well did not have production for approximately 19 months, production from the B1R well would maintain the Rockwell lease. For a period of 92 days during August, September, and October of 1985, however, there was no production from B1R. During August and October, the Turkey Creek plant did not process any gas. In September, approximately 11,884 mcf was delivered from some Brown Dolomite wells into the gathering system, and to the Turkey Creek plant. This amount was approximately one and one-half percent of the normal amount processed at Turkey Creek during September. During this 92–day period, mechanical work was performed at the Turkey Creek Plant, including overhauling compressors, installing a high-pressure inlet gas scrubber, replacing header piping, and improving the emergency shutdown system. As previously noted, the gas gathered from B1R went to the Turkey Creek plant, which was operated by Cabot. There was no evidence that the Turkey Creek plant was terminating operations, or that Cabot intended to forego taking gas from the wells serviced by the Masterson Loop line.

By letter dated May 6, 1986, Cabot notified Anadarko that the Turkey Creek Plant would not be operating from May 13, 1986, through June, 1986. For a period of

---

**2.** Westar is an operating division of Pioneer Corporation.

61 days during May and June of 1986, there again was no production from B1R.

A three-day bench trial concluded on June 3, 1999. The trial court ruled that the lease did not terminate due to the temporary cessations of production coming within the temporary cessation of production doctrine. Among the trial court's findings of fact and conclusions of law were the following:

### Findings of Fact

10. There was a total and continuous cessation of production of oil and gas from the Rockwell B1R well beginning no later than August 1, 1985 and continuing through no later than October 31, 1985.

11. There was a total and continuous cessation of production of oil or gas from the Rockwell B1R well beginning no later than May 1, 1986 and continuing through no later than June 30, 1986.

20. The only 60 day periods of time when the Rockwell Leases did not produce oil or gas was August through October of 1985 and May to June of 1986.

21. Each 60 day period of non-production was caused in whole or in part by the Turkey Creek plant being shut down, which was out of the control of Defendant.

22. Production resumed within a reasonable time following the cessation of production that occurred during the August through October 1985 time period.

23. Production resumed within a reasonable time following the cessation of production that occurred during the May to June 1986 time period.

### Conclusions of Law

2. The cessation of production on the lease in question for the time period of August through October of 1985 was a temporary cessation due to sudden stoppage of the well, or some mechanical breakdown of the equipment used in connection therewith, or the like.

3. The cessation of production on the lease in question for the time period of May to June of 1986 was a temporary cessation due to sudden stoppage of the well, or some mechanical breakdown of the equipment used in connection therewith, or the like.

4. The lease in question did not terminate as a result of the cessation of production that occurred during the August through October of 1985 time period.

5. The lease in question did not terminate as a result of the cessation of production that occurred during the May to June 1986 time period.

Krabbe filed a Request for Additional and Amended Findings of Fact. Krabbe requested the following additional findings of fact, among others:

2. The total and continuous cessation of oil and gas production from the Leased Premises from 1 August 1985 through 31 October 1985 was reasonably foreseeable by the operator and avoidable.

3. The total and continuous cessation of oil and gas production from the Leased Premises from 1 May 1986 through 30 June 1986 was reasonably foreseeable by the operator and avoidable.

Krabbe's first issue is: Whether Anadarko established that the undisputed cessations of production were excused under the "temporary cessation of production"

doctrine. Krabbe urges that the evidence was legally insufficient, and in the alternative, factually insufficient, to support the trial court's findings of fact and conclusions of law to the effect that Anadarko did so. Krabbe specifically challenges the trial court's finding of fact 21, conclusions of law 2, 3 and 4, and the failure of the trial court to find Krabbe's requested additional findings of fact 2 and 3. Krabbe, in substance, asserts that the causes of the periods of cessation of production were such that the cessations of production should not be encompassed within, and thereby excused by, the temporary cessation of production doctrine engrafted by the courts on leases such as the one before us. Krabbe does not challenge findings by the trial court that the two undisputed cessations of production were temporary in nature and that production was resumed within a reasonable time following the periods of cessation. Rather, his appeal is based on the contentions that (1) but for a pricing dispute as to the Brown Dolomite gas from well 1–102, which resulted in the 19–month period of non-production from the well while Anadarko and Cabot negotiated and litigated, the two periods of cessation of production would not have occurred; (2) during the periods of non-production, Anadarko could have and should have, in the exercise of reasonable diligence, bypassed the Turkey Creek plant by connecting the Panhandle 10–inch pipeline to another transmission line and thereby produced gas from the Brown Dolomite formation on the lease; and (3) that both the pricing dispute and the Turkey Creek plant shutdowns were foreseeable, avoidable, non-physical, marketing problems excluded from the temporary cessation of production doctrine. In support of this assertion, Krabbe relies heavily on *Watson v. Rochmill,* 137 Tex. 565, 155 S.W.2d 783 (1941), *Midwest Oil Corp. v. Winsauer,* 159 Tex. 560, 323 S.W.2d 944 (1959) and *Scarborough v. New Domain Oil & Gas Co.,* 276 S.W. 331 (Tex.Civ. App.—El Paso 1925, writ dism'd w.o.j.). Krabbe also argues that the temporary cessation doctrine should not encompass non-production causes beyond the point of sale for the gas, which in this case would be the meters at the wellheads. If the doctrine were so limited, shutdown of processing plants such as Turkey Creek would not excuse cessations of production.

At the outset, appellee urges that appellant's first issue and brief are insufficient to challenge the legal and factual sufficiency of the evidence. After review of the issue as formulated, appellant's brief, appellee's brief, and subsequent briefs from both parties, we conclude that appellant's issue and brief are in substantial compliance with the appellate rules, and sufficiently acquaint this court and appellee with the issues and present argument enabling response by appellee and decision by this court. TEX.R.APP. P. 38.9. We will address the merits of the appeal.

### STANDARD OF REVIEW

Findings of fact entered in a case tried to the court have the same weight, force, and dignity as a jury's verdict upon jury questions. *See Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). A trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing sufficiency of the evidence supporting jury findings. *Id.* To determine whether there is legally sufficient evidence, all the record evidence and inferences must be viewed in a light most favorable to the findings. *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex. 1998). Anything more than a scintilla of evidence is legally sufficient to support the findings. *Id.* In considering a factual suffi-

ciency issue, we review all the evidence and reverse only if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1952). However, we are not to reweigh the evidence and set aside the finding merely because we are of the opinion that a different result is more reasonable. *Pool,* 715 S.W.2d at 634.

 We do not accord such deference to the trial court's conclusions of law as we do to its findings of fact, however. We review the conclusions of law *de novo* to determine their correctness, *see State v. Heal,* 917 S.W.2d 6, 9 (Tex.1996); *Barber v. Colorado Indep. Sch. Dist.,* 901 S.W.2d 447, 450 (Tex.1995); *Hydrocarbon Mgt. v. Tracker Exploration,* 861 S.W.2d 427, 431 (Tex.App.—Amarillo 1993, no writ), although if the trial court's conclusions are erroneous, the judgment will not be reversed if the controlling findings of fact support a correct legal theory. *Hitzelberger v. Samedan Oil Corp.,* 948 S.W.2d 497, 503 (Tex.App.—Waco 1997, pet. denied); *Westech Eng'g v. Clearwater Constructors, Inc.,* 835 S.W.2d 190, 196 (Tex.App.—Austin 1992, no writ).

## TEMPORARY CESSATION OF PRODUCTION

### A. Law

 The language of a typical oil or gas lease is such that the lease may be kept alive after the primary term only by production in paying quantities or a savings clause, such as a shut-in royalty clause, continuous operations clause, drilling operations clause, etc. *Natural Gas Pipeline Co. of America v. Pool,* 30 S.W.3d 618, 626, 2000 WL 1513904 *3 (Tex.App.—Amarillo 2000, no pet. h.); *Hydrocarbon*

*Mgt.,* 861 S.W.2d at 431; *Shown v. Getty Oil Co.,* 645 S.W.2d 555, 559 (Tex.App.—San Antonio 1982, writ ref'd). In situations where there are periods of non-production from a mineral lease, and no savings clauses are embodied within the lease, cessation of production during the secondary term automatically terminates the lease. *Watson,* 155 S.W.2d at 784. But, in instances where a lease does not contain express savings provisions such as a shut-in royalty clause, a temporary cessation of production clause has been "necessarily implied" in the lease. *Midwest Oil Corp.,* 323 S.W.2d at 946. In discussing the subject, the Texas Supreme Court noted that:

> It appears to be very well settled that under the terms of the lease [under consideration], upon cessation of production after termination of the primary term, the lease automatically terminated.... The strictness of the above rule has been modified where there is only a temporary cessation of production due to sudden stoppage of the well or some mechanical breakdown of the equipment used in connection therewith, or the like. Under such circumstances, ... the lessee is entitled to a reasonable time in which to remedy the defect and resume production. *Watson,* 155 S.W.2d at 784.

 Thus, the automatic termination rule is relaxed if the lessee can prove that the cessation of production is temporary and is due to sudden stoppage of the well, some mechanical breakdown of the equipment used in connection therewith, "or the like." *Amoco Prod. Co. v. Braslau,* 561 S.W.2d 805, 809–10 (Tex. 1978); *Midwest Oil Corp.,* 323 S.W.2d at 947; *Watson,* 155 S.W.2d at 784. The lessee is entitled to a reasonable time in which to remedy the cause of the temporary cessation and resume production. *Id.* What constitutes a reasonable time depends on the facts of each case. *Id.; Cobb*

*v. Natural Gas Pipeline Co. of America,* 897 F.2d 1307, 1309 (5th Cir.1990). The lessee must act with diligence in obtaining renewed production. *See id.* at 1312. The burden is on the lessee to prove that the cessation in production fell within the temporary cessation doctrine. *Bradley v. Avery,* 746 S.W.2d 341, 343 (Tex.App.—Austin 1988, no writ).

## B. Analysis

### 1. Legal and factual sufficiency of the evidence

The habendum clause in the consolidation lease under consideration contains no savings provisions allowing the lessee to remedy cessations of production following the expiration of the primary term of the lease. Given such a provision, cessation of production during the secondary term automatically terminates the lease, unless the cessation comes within the temporary cessation of production doctrine applied by the courts to such leases. *See Watson,* 155 S.W.2d at 784.

As previously noted, whether a cessation of production is "temporary" depends primarily on the facts of the matter under consideration. For example, in *Watson,* cited by Krabbe, the oil well which held the lease produced about one barrel per day of low gravity oil to ten barrels of salt water. When the tubing became stopped up, the lessee decided that the depressed economy and the nature of the oil produced by the well did not justify operation of the well, so it was not cleaned out, and production ceased for two years and seven months. During this time the well could have produced oil. Two years after the well ceased production, the lessor sued to declare the lease terminated. The lessee contended that although oil could have been produced, it was not because there was no market for low gravity oil. After citing the general rule, as noted above, the court concluded that the lease terminated because the cessation (1) was not "merely a temporary one"—there was no production for two years and seven months, (2) was the result of a decision by the lessee not to produce oil because of conditions of the economy which did not prevent the operation of the well to produce whatever oil it would produce, and (3) was not caused by a mechanical breakdown or other condition that was associated with the well or equipment. *Watson,* 155 S.W.2d at 783–84. The court did not specify that one particular factor was determinative of its decision.

*Midwest Oil Corp.* involved a term royalty interest for fifteen years and "so long thereafter as oil, gas or other minerals, or either of them, was produced in paying or commercial quantities." Production of gas from the lease was halted during the secondary term due to litigation between the mineral lessee and the lessors, and then due to replacement of equipment on the well and an obstruction in the gas line. The cessation in gas production lasted for approximately six months. The court first determined that the principles governing construction of mineral leases with determinable fee interests should be applied in resolving the question before it because the royalty interest at issue constituted a determinable fee interest. *Midwest Oil Corp.,* 323 S.W.2d at 948. Utilizing such principles, the court held that the interruption in production did not result in termination of the royalty interest:

> In the event of temporary cessation of production under circumstances such as we have here, [the determinable royalty interest] will continue in any event as long as the operator in good faith exercises reasonable diligence. *Id.*

*Scarborough* dealt with a mineral lease wherein the lessee secured production of gas during the primary term. Shortly af-

ter the primary term expired, the casing in the well collapsed and production ceased. The lessee began operations to resume production from the well, to no avail. During the time the lessee was attempting to clear the well and secure production again, another well was completed on the lease which produced oil in paying quantities. Subsequently, a second gas well was completed which produced gas in paying quantities. The court held that despite the lapse in production between the collapse of the casing in the producing well (in which production was never restored) and the production secured from the oil well later brought in, the lease did not terminate. In so holding, the court did not undertake to set out elements of the temporary cessation doctrine, but merely concluded that the facts under consideration (provisions of the lease, production in paying quantities in the primary term, the cause of cessation of production was unforeseen and unavoidable, the lessees in good faith used reasonable diligence to resume production, and at great outlay of money, did so resume production within a reasonable time), forfeiture of the lease for temporary cessation of production without fault of the lessee should not be allowed as a matter of law. *Scarborough,* 276 S.W. at 336.

*Cobb* dealt with cessations in production of gas during the secondary term. The lease was for a primary term of ten years and "so long as oil or gas is found in paying quantities." Gas was produced from the lease continuously from the date of first production until the time of trial, except for three periods: (1) a nine-month period from December, 1946 through Au-

gust, 1947; (2) a three-month period from July, 1962, through September, 1962; and (3) a nine-month period from May, 1974, through January, 1975. The lessee's explanation for the cessation of production during each of the three periods was that a difference developed in pressure between gas flowing from wells on the lease and pressure in the main pipeline into which gas from the wells flowed. According to lessee's evidence, which was not rebutted by the lessors, once the pressure differential problems were corrected by installation of compressors, gas from the lease wells again flowed into the main gathering pipeline, and production resumed. The district judge, trying the case without a jury, found that the lease terminated in 1974 for lack of production. The Fifth Circuit reversed and directed that judgment be entered in favor of the lessee.[3] In so doing, the Fifth Circuit held that the lessee acted diligently and that production resumed within a reasonable period of time, even considering that the lessee apparently took no action to restore production during a two month period of time from May, 1974, when production ceased, until July, 1974, when work was initiated on the well to obtain resumed production. *Cobb,* 897 F.2d at 1312.

 In contrast to the facts in *Watson,* the record before us does not reflect that either Anadarko or Cabot intended to cause wells that could produce gas to cease production for an indefinite length of time because production was not economic, or for any other reason. The trial judge considered evidence concerning negotiations, litigation and eventual settlement between

**3.** The Fifth Circuit noted that the trial court did not make conclusions of law that cessations of production prior to the 1974 cessation effected a termination of the lease. By its directing entry of judgment for the lessee, as opposed to remanding for the trial court to

determine whether the earlier cessations of production terminated the lease, the appellate court in effect concluded that none of the cessations of production worked a termination of the lease.

Anadarko and Cabot concerning whether the 1964 gas purchase contract was renewed in 1984. The conflict as to gas from 1–102 pre-dated and continued through the two periods during which non-production from the Rockwell lease is claimed to have caused termination of the lease. The record reflects that during the periods of non-production in August, September and October, 1985, and May and June, 1986, Anadarko was continuing its quest to have Cabot resume accepting gas from 1–102 under the agreement Anadarko contended was in place, and that Anadarko had no information that Cabot's Turkey Creek plant would fail to resume accepting normal gas quantities from B1R. Whether Anadarko acted in good faith and diligently by waiting for the anticipated resumption of processing by the Turkey Creek Plant instead of undertaking to re-work the Panhandle 10–inch pipeline to circumvent Cabot's Turkey Creek Plant with gas from 1–102 during its controversy with Cabot over whether a contract existed for Cabot to take gas from 1–102 and other Brown Dolomite wells, was for the trial court to determine from the evidence.

Appellant refers to *Gulf Oil Corp. v. Reid,* 161 Tex. 51, 337 S.W.2d 267 (1960), in asserting that the "reasonable time" for a lessee to obtain resumption of production following a temporary cessation is the time it would take to lay gathering lines to a market. *Reid,* however, was construing the language of a shut-in clause in a lease, and duties of the lessee pursuant to such a clause, not a lease without savings clauses of any kind, as we have before us. We do not consider *Reid* controlling of our decision.

In making its findings and conclusions, the trial court was to consider all the evidence before it, including the longstanding relationship between Anadarko and its predecessors, as lessees, and Cabot and its predecessors; the alternatives available to Anadarko to market gas from the wells in light of the facts surrounding Turkey Creek plant shutdowns; and Anadarko's other actions. We are not to reweigh the evidence and set aside the trial court's findings merely because we might be of the opinion that a different result is more reasonable. *Pool,* 715 S.W.2d at 634.

The evidence before the trial court was legally and factually sufficient to support its finding and conclusion that the temporary cessation of production from B1R, which was the well holding the lease by production, was due to a cause "like" those causes permitted under *Watson.* The evidence was likewise legally and factually sufficient to support the trial court's finding and conclusion that Anadarko diligently and in good faith sought to re-establish production. *See Cobb,* 897 F.2d at 1312 (two month period of inactivity by lessee and total cessation of production for nine months did not preclude finding of diligence by lessee and resumption of production within a reasonable time). The evidence is legally and factually sufficient to support the trial court's finding of fact 21 and the findings included in its conclusions of law 2, 3 and 4.

2. Causes of cessation of production after the point of sale and *force majeure*

We do not concur with Krabbe's assertions that the cessation of production doctrine should be limited to cessations due to causes arising prior to the point of sale of gas from the well, or to physical or mechanical causes. In *Midwest Oil Corp.,* the Texas Supreme Court held that the royalty interest was not terminated where the temporary cessation of production was due in part to litigation between a lessee and lessor, and due in part to the lessee's removal of equipment

from the well site. The cause of the cessation in that case was not limited to causes prior to the point of sale. Krabbe's assertion that the temporary cessation of production doctrine should be limited to occurrences prior to the point of sale is closely akin to the claim that permitting shutdown of the Turkey Creek processing plant for what the trial court could have inferred from the evidence to have been temporary re-working or maintenance work is, in effect, construing a *force majeure* clause into the lease when none exists. But, if savings provisions such as a *force majeure* clause had been placed in the lease by the parties, a temporary cessation of production clause would not be "necessarily implied" by the courts to begin with. *See Midwest Oil Corp.*, 323 S.W.2d at 946.

The doctrine of temporary cessation of production is well established in Texas jurisprudence, as acknowledged in appellant's able brief. The authorities cited by Krabbe do not preclude the trial court from considering evidence of the shutdown of the Turkey Creek plant and reasons therefor, and evidence about the conduct and status of negotiations and litigation between Anadarko and Cabot during the times of the lack of production, even if that evidence would fit into what would qualify as a *force majeure*, if such a clause were in the lease.

### 3. Foreseeability of and avoiding cessations of production

■ We next consider Krabbe's assertion that the trial court erred in failing to make findings of fact 2 and 3 which he requested. In doing so, we first evaluate whether such findings would have been material to an ultimate issue, and thus would warrant reversal of the judgment, if they had been found by the trial court as requested by Krabbe. *See Boudreaux*

*Civic Ass'n v. Cox*, 882 S.W.2d 543, 550 (Tex.App.—Houston[1st Dist.] 1994, no writ) (additional findings of fact are required only when they are necessary to determine ultimate or controlling issues).

The proposed requests deal with the foreseeability and avoidability of the cessations of production. Although some of the cases reference foreseeability of and avoidability of cessation of production or its causes, examination of the opinions in those cases indicates that the references are descriptive of the particular facts involved, and do not establish foreseeability and avoidability as elements of the temporary cessation doctrine. For example, in *Scarborough* the court noted that forfeiture of the lease "for temporary cessation of production without fault of the lessees" should not be allowed as a matter of law, and referred to the cause of the loss of production as "necessarily unforeseen and unavoidable." *Scarborough*, 276 S.W. at 336. Yet, in its opinion, the court noted that the gas well which was holding the lease began leaking water and the casing was lifted to attempt to correct the leak. The casing then collapsed in the well, an event the court noted was shown by the evidence "to be not an unusual occurrence." *Id.* at 333. The opinion does not indicate any inquiry into the foreseeability of the water leakage or the casing collapse or the care taken by the lessees to avoid such a significant, but not unusual, occurrence. And, in *Cobb*, also cited by Krabbe, the court did not attach significance to whether the repeated periods of lost production due to similar, if not the same, line pressure problems were either foreseeable or avoidable. The court merely referenced *Watson* in stating the elements of the temporary cessation doctrine to be: (i) the cessation of production must be "due to a sudden stoppage of the well or some mechanical breakdown of the equipment used in connection therewith, or the like," and

(ii) the lessee must remedy the problem and resume production within a "reasonable time." *Cobb*, 897 F.2d at 1312 n. 7. The court concluded that the 1974 pressure difficulty fit within the first element prescribed by *Watson*, and then determined that production was resumed within the reasonable time required by *Watson* despite existence of a two month delay between cessation of production and beginning of work by the lessee to re-establish production, and a total of nine months before production was resumed. *Id.* at 1312.

Even assuming, without deciding, that the evidence conclusively established Krabbe's proposed findings of fact 2 and 3, and that the trial court abused its discretion in failing to make such findings, the findings would not have required entry of a different judgment. *See Watson*, 155 S.W.2d at 783–84. Therefore, any error in failing to make the findings did not cause the rendition of an improper judgment, and would not warrant reversal of the judgment. Tex.R.App. P. 44.1(a); *see Boudreaux Civic Ass'n*, 882 S.W.2d at 550.

Krabbe's first issue is overruled.

## ATTORNEYS' FEES

■ By his second issue, Krabbe challenges the award of attorneys' fees to Anadarko. Krabbe originally based his appellate challenge to the award on the claim that the trial court erred in its declaration that the lease did not terminate, and that the award of attorneys' fees, therefore, should be reversed because it was based on the erroneous premise that appellee was the prevailing party. His challenge did not urge that the trial court abused its discretion in awarding attorney fees if the underlying judgment was correct, nor did he challenge the amount of the fee award.

In post-submission briefing, Krabbe contends that this court's recent decision in *Natural Gas Pipeline Co. of America v. Pool*, 30 S.W.3d 639 (Tex.App.—Amarillo 2000, no pet. h.) mandates reversal of the award of attorney's fees regardless of whether the judgment in favor of Anadarko is reversed. Krabbe's post-submission brief maintains that according to *Pool*, the underlying suit to declare the Rockwell lease terminated was essentially an action for trespass to try title and not a suit for declaratory judgment, and that attorney's fees are not recoverable in a trespass to try title suit.

Anadarko's response is that it is entitled to attorneys' fees if the trial court judgment is affirmed, because Krabbe asserted no basis for reversing the award other than that award of attorneys' fees to Anadarko was improper because the judgment in favor of Anadarko was erroneous. In response to Krabbe's post-submission briefs, Anadarko asserts, in part, that Krabbe did not preserve error in regard to the claim that Anadarko is not entitled to recover attorneys' fees because the underlying suit is essentially a trespass to try title suit.

In *Pool*, no question of preservation of error was raised to the challenge of attorney's fees on the basis that the suit was not appropriately cast as a declaratory judgment action, but was, rather, at bottom, a trespass to try title action. Indeed, in *Pool*, the appellees urged in opposition to appellant's equitable defense of laches, that the action was a suit for title, in the nature of trespass to try title. *Id.* at 649.

In the matter before us, both appellant and appellee pled for and sought attorney's fees pursuant to the declaratory judgment act. Appellants did not, however, urge at the trial court level that appellee should not recover attorney's fees because the suit was in essence a suit for

title rather than being properly a declaratory judgment action. Nor did appellant so assert in this court until after oral submission. We recognize that our opinion in *Pool* was not issued until after trial of the case, filing of appellate briefs and oral submission. Nevertheless, to preserve a complaint for appellate review, a party must present the complaint to the trial court by a timely request, motion, or objection, state the specific grounds therefor, and obtain a ruling. TEX.R.APP. P. 33.1(a); *Holland v. Wal–Mart Stores, Inc.,* 1 S.W.3d 91, 94 (Tex.1999); *In re C.O.S.,* 988 S.W.2d 760, 764–65 (Tex.1999); *General Chem. Corp. v. De La Lastra,* 852 S.W.2d 916, 920–21 (Tex.1993) (appellate argument that maritime law preempted state law was not preserved because of failure to bring issue to trial court's attention, despite assertion that law changed during appellate process).

Appellants did not preserve error in regard to the argument that attorneys' fees were erroneously awarded because the suit was, in substance, a trespass to try title suit. Because the error was not preserved and we have previously failed to find reversible error in the trial court's ruling that the lease did not terminate, we overrule appellant's second issue.

The judgment of the trial court is affirmed. TEX.R.APP. P. 43.2(a).