

# NUMBER 13-15-00013-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

CRIMSON EXPLORATION, INC., ET AL.,                    Appellants,

v.

MAGNUM PRODUCING L.P.,                                Appellee.

### On appeal from the 25th District Court
### of Lavaca County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Benavides**
**Memorandum Opinion by Chief Justice Valdez**

Appellee Magnum Producing L.P. (Magnum) sued appellant Crimson Exploration Inc. et al. (Crimson) claiming a right to mineral interests and back payments consistent with those interests. On competing motions for summary judgment, the trial court entered judgment for Magnum. By five issues, Crimson contends that the trial court erred in granting Magnum's motion for summary judgment. By one cross-issue, Magnum

contends that the trial court erred in failing to award prejudgment interest on back payments that Crimson withheld. We affirm as modified.

## I. BACKGROUND

Since the 1990s, Magnum has held an interest in an oil and gas lease (the "Simpson Lease") operated by Crimson[1] in Lavaca County, Texas. As early as 1997, a question arose regarding the Simpson Lease's validity. That question was answered a decade later, in 2006, when the trial court entered a judgment declaring that the Simpson Lease terminated as of 1996 (Castle Judgment).

Magnum was not a party to the Castle Judgment. However, the Castle Judgment's decree that the Simpson Lease terminated in 1996 incidentally brought new litigation involving three top leases (the Zalman Leases) taken by Crimson on the Simpson Lease acreage in 2001, 2003, and 2006, respectively. The central question in this appeal is whether Magnum owns part of the Zalman Leases based on a settlement agreement between Crimson and Magnum before the trial court handed down the Castle Judgment.

**2001**

In 2001, Magnum and Crimson resolved then-existing uncertainty about the Simpson Lease's validity by signing a Master Settlement Agreement ("MSA"). Under the MSA, Magnum received a 1% overriding royalty in production under the Simpson Lease. The MSA also gave Magnum the right to convert its 1% overriding royalty to a 26.25% working interest after a well on the Simpson acreage "paid out." A well "pays out" when revenues produced from the well meet the cost of drilling. Under the MSA, Magnum's right to convert its 1% royalty to a 26.25% working interest after payout applied to all strata

---

[1] The operating entity in contractual privity with Magnum has changed over the years. For clarity, we refer to the various defendants who served as operator of the subject leases as "Crimson."

except 12,075 to 12,265 feet (the "Magnum Reserved Zone"), where Magnum's working interest is roughly four times larger than its after-payout working interest in production from other strata.

Additionally, the MSA ensured that Magnum's interest would continue after the Simpson Lease terminated. Specifically, paragraph 9B of the MSA provided that Magnum had a right to participate in "any extension or renewal of the [Simpson Lease] obtained within one (1) year of the expiration of [the Simpson Lease]." Notably, neither Magnum nor Crimson could have known in 2001 when they signed the MSA that the Simpson Lease had already expired in 1996, according to the 2006 Castle Judgment.

Unable to predict the future in 2001, Crimson took a "top lease" covering the Simpson Lease acreage ("2001 Zalman Lease").[2] A top lease is a contingency lease covering the same acreage as an underlying lease. A top lease activates if and when the underlying lease terminates. A cloud of uncertainty surrounded the Simpson Lease in 2001, so the 2001 Zalman Lease was intended to preserve Crimson's interest in continuing to explore and operate on the Simpson acreage after the Simpson Lease expired.

In 2001, Crimson also completed its first well on the Simpson Lease acreage ("Zalman No. 3 well"). The Zalman No. 3 well was initially completed outside the Magnum Reserved Zone. However, in 2006, Crimson recompleted the Zalman No. 3 well in the Magnum Reserved Zone, effectively quadrupling Magnum's pay out as per the MSA. Magnum would not discover payment arrearages until a few years later.

---

[2] The 2001 Zalman Lease terminates as to all depths below 12,846 feet.

**2003**

In 2003, Crimson took a second top lease on the Simpson acreage (the "2003 Zalman Lease").[3]

Thereafter, Crimson and Magnum executed an agreement (the "Letter Agreement"). At the heart of this appeal lies a disagreement between the parties as to the legal effect of the Letter Agreement on Magnum's interest in the top leases covering the Simpson acreage. The Letter Agreement provides, in relevant part, as follows:

> You [Crimson] agree that the following described Oil and Gas Leases (called herein the "Zalman Leases"), to wit:
>
> a. [The 2001 Zalman Lease];
>
> . . .
>
> c. [and] any other top leases taken by you or assigned to you prior to this date or which are taken and/or which become effective within one year of release of all or part of the lands covered by the Simpson Lease
>
> shall each be considered for all purposes (and in particular for the purposes of Paragraph 9B of the [MSA]) as "renewal(s) and extension(s) obtained within one (1) year of the expiration" of the Simpson Lease, so that Magnum shall be entitled to all interests otherwise credited it under the [MSA] relative to the Simpson Lease as to such leases.
> . . .
>
> The parties agree that this letter agreement is a letter of intent and that the parties shall enter into such further agreements and assignments as are necessary to effectuate the intent expressed herein. It is agreed that the guiding purpose of this agreement is for you to assign to Magnum interests in the Top Leases, so that Magnum can farmout[4] to you the depths covered

---

[3] The 2003 Zalman Lease terminates as to all depths below 14,532 feet.

[4] In the oil and gas context, a "farmout" is an assignment by a lease owner (Magnum) of all or a portion of the lease to a lease operator (Crimson) who desires to drill on the tract. *See United Oil & Minerals, Inc. v. Costilla Energy, Inc.*, 1 S.W.3d 840, 843 n.2 (Tex. App.—Corpus Christi 1999, pet. dism'd). The primary characteristic of the farmout is the assignee's obligation to drill one or more wells on the assigned land as a prerequisite to completion of the transfer. *See ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d 303, 313 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

4

by the Top Leases (whether under the Simpson Lease or the Top Lease) and to ensure that Magnum shall continue to be vested, as to the Top Leases and the Zalman Leases, each and every interest as otherwise credited to Magnum under the Simpson Lease in the [MSA] . . . provided however that the obligation of [Crimson] to assign to Magnum certain deep rights under the Simpson Lease, the Top leases and/or the Zalman Leases . . . shall be extended to [July 1, 2005], at which time such obligation shall arise. This agreement shall, in all things, be binding upon the parties hereto and their successors and assigns.

Crimson interprets this Letter Agreement as not having accomplished an assignment to Magnum of any interest in the 2001 and 2003 Zalman Leases, but instead as having merely expressed an intent to assign to Magnum those interests at some point in the future.

## 2004

Two events occurred in 2004 as it relates to this appeal. First, Crimson drilled a second well—the Zalman No. 4 well—at a depth interval below 14,223 feet. Significantly, Crimson had no right to drill at those depths unless Magnum had farmed-out to Crimson the right to do so.

Second, the Zalman No. 3 well paid out—meaning revenues from that well met the cost of drilling. This triggered Magnum's right, as per the MSA, to convert its 1% overriding royalty to a 26.25% working interest, which Magnum did. For the next six years, Crimson treated Magnum as a working interest owner in the Zalman No. 3 well, billing Magnum for expenses and seeking its consent to continue and maintain operations.

5

**2006–2009**

In 2006, Crimson took a third top lease on the Simpson acreage ("2006 Zalman Lease").[5]

Also in 2006, the trial court handed down the Castle Judgment, which declared that the Simpson Lease terminated as of 1996. However, Crimson treated Magnum in the same manner that it did before the Castle Judgment, as evidenced by Crimson's billing memorandum reflecting that: "Per agreement with [Magnum], they participate whether the Simpson [lease] is valid or not. . . ." Crimson's practice of treating Magnum as a working interest owner on the Simpson tract would continue until May 2009, when Crimson inconspicuously changed its internal records to reflect that Magnum never owned any interest in any of the wells drilled on the Simpson acreage; notably, two months prior to this, Magnum had informed Crimson that back pay in excess of $4 million was owed, according to an accounting done by Magnum.

**2010 Lawsuit**

Magnum sued Crimson in 2010 after the parties were unable to resolve their differences. Magnum asserted a cause of action for breach of contract, alleging that Crimson withheld amounts owed based on production from wells on the Simpson tract. Magnum later amended its petition to request a declaratory judgment concerning its interest on the Simpson acreage.

Crimson responded that Magnum's lawsuit was barred by the four-year statute of limitations governing breach of contract actions. According to Crimson, the Letter Agreement did not assign any interest in the Zalman Leases to Magnum, but instead

---

[5] The 2006 Zalman Lease terminates as to all depths below 12,234 feet.

merely obligated Crimson to assign those interests by the July 2005 deadline set out in paragraph two of the Letter Agreement. Crimson argued that the breach occurred when it failed to assign those interests by July 2005, and therefore, Magnum had until July 2009 to file suit. Crimson calculated that because Magnum filed suit in 2010, the suit was barred by the four-year statute of limitations.

## Trial Court's Judgment

On competing motions for summary judgment, the trial court granted Magnum's motion and denied Crimson's. In its judgment, the trial court awarded Magnum an interest under the Zalman Leases. Specifically, the trial court declared that the settlement agreements entered into by the parties, including the Letter Agreement, "are binding on [Crimson] and give [Magnum] the right to participate in any renewal, extension, or top lease taken by [Crimson] . . . covering lands that were the subject of the Simpson Lease, and which are taken by or assigned to [Crimson] before [the Letter Agreement], or which became effective within one year of the expiration date of the immediately preceding lease covering lands that were the subject of the Simpson Lease, including but not limited to" the Zalman Leases. The trial court's judgment also awarded $4,383,979.74 in proceeds from production that Crimson had not paid Magnum. Crimson challenges this portion of the judgment by five issues. We address the issues that are dispositive to Crimson's appeal in Parts III–IV of this opinion.

The judgment does not award prejudgment interest on royalties that Crimson withheld. By one cross-issue, Magnum challenges this portion of the judgment. We address Magnum's sole cross-issue in Part V of this opinion.

7

## II. STANDARD OF REVIEW

This Court reviews a summary judgment de novo. *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 n.7 (Tex. 2005); *Knapp Med. Ctr. v. Grass*, 443 S.W.3d 182, 187 (Tex. App.—Corpus Christi 2013, pet. denied). A summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c). In determining whether a genuine issue of material fact exists, evidence favorable to the nonmovant is taken as true, and all reasonable inferences are resolved in its favor. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997).

When, as here, the trial court grants one party's motion for summary judgment and denies the other, we review the summary judgment evidence presented by each party, determine all questions presented, and render the judgment that the trial court should have rendered. *See Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007).

## III. REAL PROPERTY INTEREST

An interest in an oil and gas lease is considered a real property interest. *See Matagorda Cty. Appraisal Dist. v. Coastal Liquids Partners, L.P.*, 165 S.W.3d 329, 332 (Tex. 2005). As such, the instrument conveying the interest must contain the essential characteristics of a deed. *Gordon v. W. Houston Trees, Ltd.*, 352 S.W.3d 32, 43 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

By its first issue, Crimson contends that the trial court erred in awarding Magnum a real property interest in the Zalman Leases absent proof that Crimson formally

8

conveyed or assigned such interest to Magnum. Crimson further asserts that neither the MSA nor the Letter Agreement was sufficient to convey such interest. We disagree.

There is no requirement that the instrument have all the formal parts of a deed recognized at common law or contain technical language to be effective. *See Green v. Canon*, 33 S.W.3d 855, 858–59 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Instead, a writing is effective if, when read in its entirety, one can ascertain a grantor and grantee and intent by the grantor to convey an interest in sufficiently described realty to the grantee. *Id.* No technical words, such as "convey," "sell," "grant," "assign" or the like, need be used to express the requisite intent; it is enough if the words actually used reveal an intent to convey. *See id.*; *see also MCT Energy, Ltd. v. Collins*, No. 07-13-00304-CV, 2014 WL 5422918, at *2 (Tex. App.—Amarillo Oct. 21, 2014, no pet.) (mem. op.).

Here, the MSA ensured that Magnum's interest under the Simpson Lease would continue as to "any extension or renewal of the [Simpson Lease] obtained within one (1) year of the expiration of [the Simpson Lease]." The Letter Agreement specifically applies to the 2001 Zalman Lease and other top leases described in paragraph "c," whether or not those leases became effective within one year of the Simpson Lease's termination. The key phrase is "shall be considered for all purposes" in the Letter Agreement, which means that, even if the Zalman Leases would not otherwise qualify under the MSA as timely extensions on the Simpson Lease, *the parties agreed to treat them as such*. Given the cloud of legal uncertainty surrounding the Simpson Lease in 2003, it is only natural that the parties agreed to treat the Zalman top leases as valid extensions on the Simpson Lease. Pursuant to this agreement, Magnum elected to become a working interest owner in the Zalman No. 3 well when that well paid out. Upon such election, Magnum became

9

vested with all rights guaranteed to a working interest owner. And Crimson treated Magnum as a working interest owner.

The MSA and the Letter Agreement, taken together, constitute an executed contract of conveyance as to the 2001 and 2003 Zalman Leases. Crimson had no right to drill the deep rights under the Simpson Lease in 2004 (which the parties considered effective at the time) unless the Letter Agreement effectively assigned (or farmed) those rights out to Crimson. In exchange, Crimson conveyed Magnum settlement share rights in then-existing leases within the scope of the Letter Agreement, including the 2001 and 2003 Zalman Leases.

Furthermore, Magnum is entitled to participate in the 2006 Zalman Lease. The Letter Agreement applied not only to top leases taken by Crimson at the time of the Letter Agreement in 2003 but also to any future top leases which became effective within one year of the release of all or part of the lands covered by the Simpson Lease. There was no answer regarding the Simpson Lease's validity until the trial court handed down the Castle Judgment in 2006. The Castle Judgment, in essence, released the lands covered by the Simpson Lease when it determined that the Simpson Lease expired. We conclude, as did the trial court, that the 2006 Zalman Lease, which was taken within one year of the Castle Judgment, constituted a timely extension of the Simpson Lease pursuant to the Letter Agreement's extension clause.

Crimson asserts that the MSA and the Letter Agreement were not formal enough to confer upon Magnum an interest in the Zalman Leases. However, as previously mentioned, "[t]here is no longer a requirement . . . that a deed or instrument to effect conveyance of real property have all the formal parts of a deed . . . or contain technical

10

words." *Green v. Canon*, 33 S.W.3d 855, 858–59 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Instead, it is enough if the words used reveal intent to convey. *MCT Energy, Ltd.*, 2014 WL 5422918 at *2; *see Harlowe v. Hudgins*, 19 S.W. 364, 365 (Tex. 1892)("No precise technical words are required to be used in creating a conveyance; the use of any words which amount to a present contract of bargain and sale is all-sufficient."). "The word 'assign' is tantamount to the word 'grant,' which is an operative word of conveyance." *Neeley v. Intercity Mgmt. Corp.*, 623 S.W.2d 942, 951 (Tex. App.—Houston [1st Dist.] 1981, no writ). Here, paragraph one of the Letter Agreement provides that Crimson's intent is to "assign" the settlement share rights in the top leases to Magnum, which included the 2001 and 2003 Zalman Leases. Paragraph two of Letter Agreement provides that Magnum "shall be entitled" to settlement share rights and that "[t]his agreement shall, in all things, be binding upon the parties hereto and their successors and assigns." Under the above authorities, we conclude this language is sufficient to convey.

Crimson further argues that the Letter Agreement was not effective to grant Magnum rights in the Zalman Leases because it contemplated future assignments. However, the Letter Agreement contemplated future assignments *only to the extent that the parties believed that such assignments were necessary* to ensure that Magnum would continue to be vested as to every interest that the MSA credited to Magnum under the Simpson Lease. We cannot agree that the Letter Agreement mandated future assignments of any kind—particularly when Crimson, after signing the Letter Agreement, treated Magnum as though an assignment had occurred. Additionally, the Letter Agreement's reference to a July 2005 deadline to assign applied *only* to certain deep

11

rights defined in paragraph 9K of the MSA, and Crimson drilled deep rights with the Zalman No. 4, evidencing the effect of a conveyance as to those rights.

In sum, the MSA and the Letter Agreement were intended to prevent Magnum's interest in the Simpson Lease from lapsing, and as the trial court found, those agreements were effective in doing so. After the expiration of the Simpson Lease, the lands covered by the Simpson Lease were covered by one or more of the Zalman Leases. Magnum received rights in the first lease to become effective after the Simpson Lease. Because all the leases at issue encompass the lands covered by the Simpson Lease and became effective within one year of the expiration of their respective predecessor leases, Magnum owns rights in them.

## A.   Crimson's Relief-Not-Requested Arguments are Unavailing

Magnum amended its original petition to request a declaratory judgment. Magnum did so after filing its motion for summary judgment but before the trial court granted Magnum's motion. Crimson asserts that the trial court erred to the extent that it granted declaratory relief because Magnum did not request such relief in its motion for summary judgment. According to Crimson, Magnum's motion for summary judgment requested only damages for breach of contract, and therefore, Magnum could not obtain declaratory relief without amending its motion for summary judgment, which it failed to do. We disagree.

First, an amended motion for summary judgment is not necessary when the amended petition essentially reiterates a cause of action that already appears in the motion for summary judgment. *See Fraud-Tech, Inc. v. Choicepoint, Inc.*, 102 S.W.3d 366, 387 (Tex. App.—Fort Worth 2003, pet. denied). Here, Magnum's motion for

12

summary judgment asked the trial court to determine as a matter of law that the MSA and the Letter Agreement gave Magnum rights in the relevant leases, and the trial court did so. That is the only judicial determination required to enter summary judgment on both contract liability and declaratory relief. As such, Magnum's declaratory judgment claim was derivative of its breach of contract claim. *Wilson v. Davis*, 305 S.W.3d 57, 74 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (acknowledging that the petitioner's declaratory judgment claim was derivative of liability issue). Because Magnum proved its entitlement to summary judgment on its contract claim, Magnum was not required to amend its motion. *See id.* at 73.

Second, an amended motion for summary judgment is not required when the original motion is broad enough to encompass the newly asserted claim. *See Farah v. Mafrige & Kormanik*, 927 S.W.2d 663, 671–72 (Tex. App.—Houston [1st Dist.] 1996, no writ). Here, the language used in Magnum's motion for summary judgment encompassed not only a claim for breach of contract but also a claim for declaratory relief. Therefore, Magnum was not required to amend its motion for summary judgment because the motion was broad enough to encompass declaratory relief. *See id.* Furthermore, Crimson failed to specially except to Magnum's motion for summary judgment. To the extent there was anything unclear about Magnum's motion, we conclude it was Crimson's burden to specially except. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 342 (Tex. 1993) (recognizing that "[a]n exception is required should a non-movant wish to complain on appeal that the grounds relied on by the [summary judgment] movant were unclear or ambiguous").

Crimson argues in the alternative that the judgment must be reversed because Magnum should have sought trespass-to-try-title relief instead of declaratory relief. However, even if we were to assume that a declaratory judgment was the improper vehicle to obtain the relief granted to Magnum, Crimson never raised this argument in the trial court. Instead, Crimson argued that Magnum was not entitled to declaratory relief because Magnum (allegedly) failed to request it, not because declaratory relief was categorically improper. Crimson's objections never mentioned trespass-to-try-title. We conclude that Crimson's failure to raise its trespass-to-try-title challenge in the trial court waives the error, if any. *See* TEX. R. APP. P. 33.1(a); *Krabbe v. Anadarko Petroleum Corp.*, 46 S.W.3d 308, 320–21 (Tex. App.—Amarillo 2001, pet. denied) ("Appellants did not, however, urge at the trial court level that . . . the suit was in essence a suit for title rather than being properly a declaratory judgment action . . . . Appellants did not preserve error[.]"); *see also Cabot Oil & Gas Corp. v. Healey*, *L.P.*, No. 12-11-00236-CV, 2013 WL 1282007 at *3 (Tex. App.—Tyler Mar. 28, 2013, pet. denied) (mem. op.) (holding that appellant did not preserve issue regarding trespass to try title by not raising it below).

## B.    Summary

We conclude, as did the trial court, that the MSA and the Letter Agreement were effective to convey a real property interest in the Zalman Leases. We reject Crimson's argument that the agreements were not effective to do so. We also reject Crimson's argument that the trial court granted more relief than Magnum's motion for summary judgment requested. Accordingly, we overrule Crimson's first issue.

14

## IV. BREACH OF CONTRACT

By its second issue, Crimson argues that Magnum is not entitled to recovery on its claim for breach of contract because the Letter Agreement lacked essential terms of an agreement and therefore constituted an unenforceable agreement-to-agree. Specifically, Crimson asserts that the Letter agreement "does not contain precise terms of the farmout." We disagree.

To be enforceable, a contract must address all of its essential and material terms of the agreement with a reasonable degree of certainty and definiteness. *See Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016). Although it is difficult to pinpoint what degree of particularity is necessary to meet the requirement of a reasonable degree of certainty, a contract must at least be sufficiently definite to confirm that both parties actually intended to be contractually bound. *See id.* A contract need only be definite and certain as to those terms that are material and essential to the parties' agreement. *See id.* The material terms of a contract are determined on a case-by-case basis, and each contract should be considered separately to determine its material terms. *See id.* Furthermore, "[f]orfeitures are not favored in Texas, and contracts are construed to avoid them." *Id.* at 239. Because forfeitures are disfavored, reviewing courts will find terms to be sufficiently definite whenever the language is reasonably susceptible to that interpretation. *See id.* "If an instrument admits of two constructions, one of which would make it valid and the other invalid, the former must prevail." *Id.*

The trial court correctly rejected Crimson's lack-of-definiteness argument. Crimson's argument is an ad hoc attempt to invalidate an agreement that is binding on its face, that Crimson considered binding for at least six years, on which Crimson relied to

15

drill a well, and on which Crimson based its continued billing of Magnum for lease expenses until 2009. To accept Crimson's argument would work a forfeiture on the parties' interests, which the law disfavors. *See id.* Furthermore, nothing the parties regarded as essential is omitted from the Letter Agreement. The Letter Agreement allowed Crimson to drill in certain zones and at certain depths and vested Magnum in the Zalman Leases to protect "each and every interest as otherwise credited to Magnum under the Simpson Lease in the [MSA] . . . ." Furthermore, both Magnum and Crimson took action in reliance on the Letter Agreement—Magnum by allowing Crimson to drill the Zalman No. 4, and Crimson by drilling it.

Accordingly, we overrule Crimson's second issue.[6]

## V.    PREJUDGMENT INTEREST

By one cross-issue, Magnum contends that the trial court erred in failing to award prejudgment interest on payments that Crimson withheld from Magnum pending final resolution of this dispute.

However, prejudgment interest was not recoverable if Crimson was justified in withholding payments under circumstances described in section 91.402(b) of the Texas Natural Resources Code. *See* TEX. NAT. RES. CODE ANN. § 91.402 (West, Westlaw through 2017 1st C.S.). Section 91.402(b) provides, in relevant part, that payments may be withheld without interest if there is: "(A) a dispute concerning title that would affect distribution of payments; [or] (B) a reasonable doubt that the payee (Magnum) . . . has

---

[6] Crimson's second issue also complains that Magnum's breach-of-contract claim is barred by the four-year statute of limitations. However, Crimson's argument is premised on a determination that the Letter Agreement did not effectively convey to Mangum an interest in the Zalman Leases. By overruling its first issue, we have already rejected that premise. Therefore, the limitations argument embedded in Crimson's second issue lacks merit.

16

clear title to the interest in the proceeds of production." *Id.* This case falls within these circumstances.

There were years of litigation regarding the Simpson Lease lands. Active litigation regarding the Simpson lands had waged, off and on, for nearly twenty years. Questions related to the Simpson Lease were disputed in litigation pending from 1998 to 2001 and from 2010 to the present (this case). This litigation establishes a legitimate dispute as to title that would affect payments to Magnum. *See id.*

Moreover, pervasive doubt surrounded title to the Zalman Leases—in particular with regard to Magnum's interests based on the Letter Agreement. Magnum argued that the Letter Agreement was itself the instrument that conveyed title to (and an interest in) the Zalman Leases, while Crimson argued that the Letter Agreement merely expressed an intent to convey an interest at some future time, which did not happen. Crimson's internal correspondence demonstrates the pervasiveness of the doubt regarding the legal effect of the Letter Agreement. In 2004, a title attorney advised Crimson that the Letter Agreement was "susceptible to differing interpretations" and advised Crimson to execute a formal farmout agreement with Magnum. We have already concluded, as did the trial court, that the Letter Agreement was legally effective to convey to Magnum interests in the Zalman Leases, so a formal farmout agreement was not necessary. Thus, Crimson's interpretation of the Letter Agreement did not prevail in the trial court or in this Court. However, Crimson's loss neither means that its doubt regarding the legal effect of the Letter Agreement was unreasonable, nor that the title dispute in this case lacked merit or legitimacy. *See id.*

We conclude, as did the trial court, that Crimson legitimately disputed and reasonably doubted Magnum's title to the Zalman Leases, and therefore, prejudgment interest on back pay was not recoverable as a matter of law. *See id.*; *see also Concord Oil Co. v. Pennzoil Expl. & Prod. Co.*, 966 S.W.2d 451, 461 (Tex. 1998) (holding that prejudgment interest was not recoverable because a title dispute existed and stating, "The Legislature has indicated very clearly in the Natural Resources Code that prejudgment interest is not due when disputes exist . . . over oil and gas titles"). Accordingly, we overrule Magnum's sole cross-issue.

## VI. AGREED MODIFICATION TO THE JUDGMENT

Magnum and Crimson agree that the trial court's judgment should be modified to: (1) delete references to a 2008 Zalman Lease from Exhibit "A" to the final judgment; and (2) delete references to "all depths" from paragraph "a" on page four of the final judgment; and (3) delete references to the word "all" in paragraphs five and six on page five of the judgment. We modify the judgment accordingly. *See* TEX. R. APP. P. 43.2(b). However, the judgment is affirmed in all other respects.

## VII. CONCLUSION

We affirm the trial court's judgment as modified.

/s/ Rogelio Valdez
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
28th day of December, 2017.