

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-12-00772-CV

W.H. **SUTTON**, Arctic Royalty Limited Partnership, Julie S. Mueller, Janet Lee Smith as Trustee of the Janet Lee Smith Family Trust, Anita Louise Davies as Trustee of the Anita Louise Davies Family Trust and Frederick Jackson Bell Jr. as Trustee of the Frederick Jackson Bell Jr. Family Trust,
Appellants

v.

**SM ENERGY COMPANY**,
Appellee

From the 341st Judicial District Court, Webb County, Texas
Trial Court No. 2011CVQ001903 D3
Honorable Elma T. Salinas Ender, Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:    Catherine Stone, Chief Justice
            Sandee Bryan Marion, Justice
            Patricia O. Alvarez, Justice

Delivered and Filed:  November 13, 2013

AFFIRMED

SM Energy Company ("SM"), appellee and plaintiff below, filed a declaratory judgment action seeking a declaration that a 1966 oil and gas lease terminated with respect to approximately 18,000 acres of an original 40,000-acre premises; that appellants' overriding royalty interests ("ORRIs") carved out of assignments of the lease were extinguished; and that SM was not obligated to pay appellants royalties based on their claimed ORRIs following execution of a new lease executed on the same 18,000 acres in 2010.  Appellants filed counterclaims and a request for

declaratory relief, and raised certain affirmative defenses. SM moved for summary judgment on its request for declaratory relief and on appellants' counterclaims and affirmative defenses. Without stating its grounds, the trial court granted SM's motion for summary judgment. We affirm.

## BACKGROUND

This appeal, as well as an earlier appeal to this court, has its genesis in a 1966 lease under which Sutton Producing Corporation leased approximately 40,000 acres from Briscoe Ranch for the purpose of oil and gas exploration and production. *See SM Energy Co. v. Sutton*, 376 S.W.3d 787 (Tex. App.—San Antonio 2012, pet. denied) ("*Sutton I*"). Less than two months after executing this lease, Sutton Producing Corporation assigned its interest in the 1966 lease to Kenoil Corporation and three individuals, but reserved for itself a 5.46875% ORRI. This assignment contained the following savings provision that extended the ORRI to any new leases:

> Said [ORRI] is to apply to all amendments, extensions, renewals or new leases taken on all or a part of the lease premises within one year after termination of the present lease.

In 1978, Kenoil Corporation assigned its leasehold interest to a third party and reserved an additional ORRI of 2.00%. This assignment also contained a savings provision that extended the ORRI to any new leases:

> [The ORRI] is to apply to all amendments, extensions and renewals of the lease or any part of it or to a new lease taken by the Assignee herein or his heirs and assigns on the same lease premises or any part thereof within twelve (12) months after termination of the present lease.

Over the years, drilling and production operations continued under the 1966 lease, which was amended several times. In March 2000, Crimson Energy Company L.P. ("Crimson"), a successor lessee under the 1966 lease and SM's predecessor, released about 22,000 of the original 40,000 acres under the 1966 lease back to Briscoe Ranch. Briscoe Ranch and Crimson also

amended the 1966 lease as to the remaining 18,000 acres. The amendment required Crimson to complete certain requirements by December 31, 2000 and contained a continuous drilling provision that provided in part as follows:

> If at any time after December 31, 2003, Lessee fails to commence the actual drilling operations for any well within the time interval as set forth above, or to diligently prosecute the same, or any other termination or forfeiture of condition or provision becomes effective under this lease, then this lease shall automatically terminate as to all of the lease premises, save and except only the acreage included within each well tract as defined under this amendment and Lessee shall release all depths below the base of the deepest formation from which Lessee is then currently producing oil or gas under each well tract.

In 2007, the parties again amended the lease, which contained a continuous drilling provision that provided in part as follows:

> If at the expiration of the primary term and any extensions thereof, any acreage leased herein has not been perpetuated by and ascribed to a well tract as stated herein, and Lessee is then engaged in drilling operations on a well on the leased premises, or Lessee has done so within ninety (90) days prior to the expiration of the primary term and Lessee shall have notified Lessor by written or electronic form of its intent to conduct continuous development, this lease shall remain in force and effect as to the leased premises so long as Lessee shall commence the actual drilling of an additional well or wells within one-hundred twenty (120) days after completion of the preceding well. . . . If any such additional drilling on any well drilled hereunder being continued at the expiration of the primary term or thereafter in accordance with the terms of this paragraph results in production, then this lease shall remain in full force and effect as to the well tract ascribed to each well herein according to the appropriate acreage set out in this lease.

In its motion for summary judgment on its declaratory judgment claim, SM contended it completed the drilling of the Briscoe E 1272 well on the approximately 18,000 acres on October 5, 2008. SM also contended that because the price of natural gas sharply decreased in the second half of 2008, it stopped drilling wells under the 1966 lease after completion of the Briscoe E 1272 well. However, under the continuous drilling provision, in order for the 1966 lease to remain in effect, SM was required to "commence the actual drilling of an additional well or wells within one-hundred twenty (120) days" of completing the Briscoe E 1272 well, or by February 5, 2009.

In an affidavit attached to the motion, SM's landman, Mark Cody, attested SM did not want the 1966 lease to terminate and, in late 2008, asked Briscoe Ranch to allow the lease to remain in effect even if the continuous drilling requirement was not met. According to Cody, Briscoe Ranch refused. No other wells were drilled on the land.

Cody also attested that in late 2009, SM drilled a successful Eagle Ford well on land not part of the 1966 lease. Based on this new find and changed economics, SM contacted Briscoe Ranch about again leasing the 18,000 acres. On May 1, 2010, Briscoe Ranch and SM entered into a new lease for this land ("the 2010 lease"). SM alleged it did not commence drilling another well on the 18,000 acres until May 1, 2010, well past the 120-day continuous drilling deadline of February 5, 2009; thus, the 1966 lease terminated on February 5, 2009. Therefore, SM concludes, because the 1966 lease was not amended, extended, or renewed and no new lease was executed within one year of February 5, 2009, appellants' ORRIs expired and the two savings provisions did not operate to burden the 2010 lease with appellants' ORRIs.

In their response to SM's motion for summary judgment, appellants expressly did not contest the termination of the 1966 lease or the existence of the 2010 lease. Instead, they contest SM's contention that the 1966 lease terminated on February 5, 2009. Appellants acknowledge both the 1966 lease and the 2007 amendment contain a continuous drilling provision. However, they contend the continuous drilling clause in the 2007 amendment does not state what happens when continuous drilling ceases; therefore, "nothing happened" on February 5, 2009, and the 1966 lease remained in existence because "operations" continued under the habendum clause until the new lease was executed in 2010, at which time the 1966 lease finally terminated.

### TERMINATION OF 1966 LEASE

The parties do not dispute that the mineral estate subject to the 1966 lease was past its primary term. Typically, an oil and gas lease is kept alive after its primary term only by production

in paying quantities or a savings clause such as a shut-in royalty clause, a continuous operations clause, or a drilling operations clause. *Krabbe v. Anadarko Petroleum Corp.*, 46 S.W.3d 308, 315 (Tex. App.—Amarillo 2001, pet. denied). If the lease's primary term expires when there is non-production and there is no savings clause or the lessee fails to comply with any savings clause in the lease, the lease and the lessee's determinable fee interest "automatically terminates." *Id.* The lease terminates and the fee interest reverts to the lessor without the lessor taking any legal action. *Kincaid v. Gulf Oil Corp.*, 675 S.W.2d 250, 255 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.). A lease may also terminate when the parties sign a new lease covering the same land. *Ridge Oil Co. v. Guinn Inv., Inc.*, 148 S.W.3d 143, 152-53 (Tex. 2004).

In the underlying lawsuit, the parties agree that under the 1966 lease and its amendments (1) the lease remained in effect after the expiration of the primary term so long as the lessee (here, SM) commenced the actual drilling of an additional well within 120 days of completion of the previous well and (2) the ORRIs are not extinguished or "washed out" by any amendments, extensions, and renewals of the 1966 lease or any part of it or by the taking of a new lease on the same lease premises or any part thereof within twelve months after termination of the present lease. There is also no dispute that appellants own both ORRIs. Finally, it is undisputed that the 1966 lease terminated. The dispute centers on the date of termination. If the 1966 lease terminated within twelve months of the 2010 lease, then the ORRIs remain in existence and burden that lease. If outside the twelve months, then the ORRIs were extinguished.

Termination of an oil and gas lease is a contractual matter. *See Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 424 (Tex. 2008); *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005) (oil and gas lease is a contract and its terms are interpreted as such). In construing an unambiguous oil and gas lease, we seek to enforce the parties' intent as expressed within the four corners of the lease document. *Tittizer*, 171 S.W.3d at 860; *Anadarko Petroleum Corp. v.*

*Thompson*, 94 S.W.3d 550, 554 (Tex. 2002). We construe the lease as a whole, attempting to harmonize all its parts, and attribute to the lease's language its plain, grammatical meaning unless it would undermine the parties' intent. *Anadarko*, 94 S.W.3d at 554; *see also City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005) (we construe lease and its amendments as a whole if amendments pertain to same transaction).

A typical Texas mineral lease contains a habendum clause that defines the duration of the lease, generally providing a relatively short fixed term of years as the primary term and then a secondary term for "as long thereafter as oil, gas or other mineral is produced." *Anadarko*, 94 S.W.3d at 554. During the primary term, production on any part of the land covered by the lease continues the lease in effect as to all land covered by the lease. *Ridge Oil*, 148 S.W.3d at 149. A lease that states its secondary term lasts for "as long as oil or gas is produced" automatically terminates if actual production during the secondary term ceases other than temporarily. *Anadarko*, 94 S.W.3d at 554; *Amoco Prod. Co. v. Braslau*, 561 S.W.2d 805, 808 (Tex. 1978). Here, the habendum clause contained in the 1966 lease provides as follows:

> 2. Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of (10) years from the date hereof, hereinafter called "primary term", and *as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days*. [Emphasis added.]

The lease broadly defines "operations" as "drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other minerals, whether or not in paying quantities."

Although the habendum clause typically controls a mineral estate's duration, other clauses may extend the habendum clause's term. *Anadarko*, 94 S.W.3d at 554. Thus, oil and gas leases generally also include a continuous drilling or continuous operations clause to prevent the lease

from expiring at the end of the primary term while drilling operations are in progress. These clauses, in effect, make drilling operations the equivalent of production for purposes of the habendum clause. "After an initial well has been completed as a successful producer, the lessee is required to drill additional wells without a lapse of more than a specified period, such as 120 days, between the completion of one well and the commencement of the next well, until a set number of wells have been drilled." 1 ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL & GAS § 5.2[B][3]a., at 5-24 (LexisNexis Matthew Bender, 2nd ed. 2013). Normally, the option to continue the drilling program belongs to the lessee. *Id.* "If the lessee fails to continue drilling, the lease will normally terminate as to all acreage except for a specified number of acres surrounding the completed wells" as provided in a "retained acreage" clause. *Id.*

Unlike the continuous drilling clause, the "retained acreage" clause "does not establish a specified drilling program or require wells to be drilled within a certain time sequence." *Id.* at 5-26. Similar to the continuous drilling clause, failure to fully develop the premises results in the lessee losing the undrilled portion of the lease. *Id.* "The retained-acreage clause accomplishes this result simply by providing that each well will hold only a specified number of acres." *Id.* "The time and method of designating acreage assigned to the well may also be specified." *Id.* Unless there is explicit language to the contrary, such language creates a covenant, rather than a limitation, so that the lessee's failure to comply with the designation requirement may entitle the lessor to damages, but will not result in automatic lease termination." *Id.*; *see also Parten v. Cannon*, 829 S.W.2d 327, 330-31 (Tex. App.—Waco 1992, writ denied) (same).

Here, the 2000 amendment contains a retained acreage clause and a continuous drilling clause as follows:

> 4.   On or before December 31, 2003, each well then capable of production and entitled to perpetuate acreage as a producing well, shall be entitled to perpetuate this lease only as to 160 acres. Not later than December 31, 2003, Lessee shall

designate a 160 acre production tract around each well capable of producing oil or gas in paying quantities with the boundaries of each such production tract being on survey lines where possible.

5.     Provided Lessee has timely completed all requirements under the foregoing sections 1 through 4, and provided on December 31, 2003, any acreage then covered by this lease has not been perpetuated by and ascribed to a well tract as stated above, and Lessee is then engaged in drilling operations on a well on the lease premises, this lease shall remain in force and effect as to such acreage so long as Lessee shall commence the actual drilling of an additional well within 120 consecutive days after completion of the proceeding [sic] well.  Said lease shall remain in full force and effect as to all such acreage during such drilling operations, and as long thereafter as Lessee continues to drill additional wells spudding each well within 120 days after completion of the previous well until all of the acreage covered by the lease premises shall be producing and included in a well tract or well tracts.  If, during the drilling of any well under this paragraph, Lessee loses or abandons the hole or well, then Lessee shall notify Lessor and within sixty (60) days after the abandonment of said operation, Lessee may commence of [sic] the actual drilling of a substitute well.  If any such drilling, additional drilling, or reworking operations on any well drilled hereunder being continued at the expiration of the primary term or thereafter in accordance with the terms of this paragraph results in production, then this lease shall remain in full force and effect as to the well tract described [sic] to each well herein according to the appropriate acreage set forth in this amendment.  Each well tract shall be one contiguous area and shall be designated in writing by recordable instrument in which each well tract shall be accurately described by means [sic] and bounds or other adequate description.  Such instrument shall be filed for record in the office of the County Clerk in which the well tract is situated and a copy of such instrument shall be furnished to Lessor within a reasonable time not to exceed thirty (30) days from the recordation of such instrument.

If at any time after December 31, 2003, Lessee fails to commence the actual drilling operations for any well within the time interval as set forth above, or to diligently prosecute the same, or any other termination or forfeiture of condition or provision become effective under this lease, then this lease shall automatically terminate as to all of the lease premises, save and except only the acreage included within each well tract as defined under this amendment and Lessee shall release all depths below the base of the deepest formation from which Lessee is then currently producing oil or gas under each well tract.

The 2007 amendment states as follows:

If at the expiration of the primary term and any extensions thereof, any acreage leased herein has not been perpetuated by and ascribed to a well tract as stated herein, and Lessee is then engaged in drilling operations on a well on the leased premises, or Lessee has done so within ninety (90) days prior to the expiration of the primary term and Lessee shall have notified Lessor by written or electronic form

of its intent to conduct continuous development, this lease shall remain in force and effect as to the leased premises so long as Lessee shall commence the actual drilling of an additional well or wells within one-hundred twenty (120) days after completion of the preceding well. . . . If any such additional drilling on any well drilled hereunder being continued at the expiration of the primary term or thereafter in accordance with the terms of this paragraph results in production, then this lease shall remain in full force and effect as to the well tract ascribed to each well herein according to the appropriate acreage set out in this lease.

Appellants correctly point out that the 2000 amendment, in paragraph 4, defines a well tract entitled to perpetuate the acreage under the lease as 160 acres and requires the lessee to designate a 160-acre production tract. Appellants also correctly note that the 2007 amendment, although allowing acreage to be perpetuated, does not set forth the method of attributing acreage to a well.[1] Therefore, appellants argue that because the 2000 amendment, which set forth a method of attributing acreage, was no longer in effect, and because the 2007 amendment is ambiguous, when production ceased in 2008 "nothing happened" and no lease termination resulted. Appellants conclude the 1966 lease remained in effect in its entirety because, under the habendum clause, "operations" continued to be "conducted upon said land with no cessation for more than ninety (90) consecutive days." Appellants contend the 1966 lease terminated in 2010 when the new lease was executed. With the 1966 lease terminating simultaneously with the execution of a new lease—and therefore within twelve months under the savings clause—appellants assert their ORRIs survive. We disagree.

Even if there is some ambiguity in the 2007 amendment as to the method of determining the size of the retained well tracts or the retained depth, we do not agree with appellants that any ambiguity means "nothing happened."[2] We find no ambiguity in the continuous drilling clause

---

[1] In their reply brief, appellants add that the 2007 amendment also does not indicate the depth limitation of any retained acreage.

[2] Appellants also contend SM did not designate well tracts until 2010. However, the obligation to designate a well tract and file the designation has been interpreted as a covenant, the breach of which does not result in an automatic termination of the lease. *Parten*, 829 S.W.2d at 330-31.

contained in the 2007 amendment with regard to the circumstances under which the 1966 lease would terminate. Harmonizing all the provisions together, we conclude the consistent, unambiguous intent of the parties beginning with the 1966 lease and continuing through its amendments is that the lease would terminate unless the lessee commenced drilling an additional well or wells within 120 days after completion of the previous well. *See Anadarko*, 94 S.W.3d at 554 (when lease terminates is always question of resolving parties' intention from entire instrument).

## CONCLUSION

Appellants do not dispute that SM completed a well on October 5, 2008 and did not commence drilling another well on the 18,000 acres until May 1, 2010. Therefore, we conclude under the unambiguous terms of the 1966 lease and its amendments, the 1966 lease terminated on February 5, 2009. With no new lease being executed within twelve months of that date, appellants' ORRIs expired. Therefore, the trial court did not err in granting SM's motion for summary judgment.[3]

Sandee Bryan Marion, Justice

---

[3] Because our resolution of the termination date of the 1966 lease is determinative, we need not address appellants' remaining issues. TEX. R. APP. P. 47.1. Appellants also ask this court to overrule *Sutton I* and hold that, even if the 1966 lease terminated on February 5, 2009, such a "partial release" did not trigger the one-year savings clause. We decline appellants' request that we revisit this court's opinion in *Sutton I*.