

In The

Court of Appeals

Seventh District of Texas at Amarillo

_____

No. 07-13-00439-CV
_____

XOG OPERATING, LLC AND
GERONIMO HOLDING CORPORATION, APPELLANTS

V.

CHESAPEAKE EXPLORATION LIMITED PARTNERSHIP AND
CHESAPEAKE EXPLORATION, LLC, APPELLEES

On Appeal from the 31st District Court
Wheeler County, Texas
Trial Court No. 12,375; Honorable Steven R. Emmert, Presiding

September 2, 2015

OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

This is an oil and gas "retained acreage" dispute concerning the amount of acreage, if any, reverting to the assignors upon the expiration of the primary term of an assignment of four oil and gas leases. Appellants, XOG Operating, LLC and Geronimo Holding Corporation (collectively "XOG"), brought this trespass to try title suit against

Appellees, Chesapeake Exploration Limited Partnership and Chesapeake Exploration, LLC, seeking an interpretation of the retained acreage clause contained in an assignment of lease interests, entered into between Xeric Oil & Gas Corporation and Geronimo Holding Corporation, as assignors, and Chesapeake's predecessor-in-title, EOG Resources, Inc., as assignee, concerning 1,625 acres of land in Wheeler County. Both sides moved for summary judgment on this dispositive issue. The trial court granted Chesapeake's motion, denied XOG's motion, and rendered a final judgment that XOG take nothing. We affirm the judgment of the trial court.

## BACKGROUND

The record reflects that, effective June 1, 2003, Xeric Oil & Gas Corporation and Geronimo Holding Corporation assigned their interest in four oil and gas leases, containing 1,625 acres, more or less, in three sections in Wheeler County, Texas,[1] to EOG Resources, Inc. The habendum clause of the assignment agreement provided for a primary term of two years and "as long thereafter as operations . . . are conducted upon [the leased premises] with no cessation for more than sixty (60) consecutive days." The assignment further provided that "[a]fter the expiration of the Primary Term, . . . all rights under this [assignment agreement] . . . shall terminate, and said lease shall revert to Assignor, except as expressly provided in Article IX." In pertinent part, Article IX states:

> Upon expiration of the Primary Term of this Assignment . . . this Assignment and all rights created hereunder shall terminate as to all lands and depths covered hereby. Said lease shall revert to Assignor, <u>save and except that portion of said lease included within the proration</u> or pooled <u>unit of each well</u>

---

[1] Specifically, Sections 6 and 7, Block E, GW Jacobs Survey, Wheeler County, Texas, and Section 6, Block 1, B&B Survey, Wheeler County, Texas.

<u>drilled under this Assignment</u> and producing or capable of producing oil and/or gas in paying quantities. <u>The term 'proration unit' as used herein, shall mean the area within the surface boundaries of the proration unit then established or prescribed by field rules</u> or special order of the appropriate regulatory authority <u>for the reservoir in which each well is completed. In the absence of such field rules</u> or special order, <u>each proration unit shall be deemed to be 320 acres</u> of land in the form of a square as near as practicable surroundings [sic] a well completed as a gas well producing or capable of production in paying quantities . . . . Upon termination or partial termination of this Assignment and the rights created hereunder, Assignee shall promptly provide Assignor with a fully executed and recordable release of this Assignment . . . .

(Emphasis added).

During the primary term of that agreement, EOG and its successors drilled six gas wells—two in each of the three sections.[2] Five of the six wells were placed in the Allison-Britt Field, and the remaining well was contained in the Stiles Ranch (Granite Wash) Field. According to Rule 2 of the field rules applicable to the Allison-Britt Field, for purposes of an allowable assignment, the maximum area of a "prescribed proration unit" was 320 acres. That rule further provides that because a standard proration unit consists of 320 acres, any unit containing less than 320 acres is, by definition, a "fractional proration unit." There were no field rules or special orders applicable to the Stiles Ranch (Granite Wash) Field.

The parties agree that there were no pooled units formed under this agreement and that the six wells completed by Chesapeake were each "producing or capable of producing oil and/or gas in paying quantities." Therefore, the resolution of this appeal

---

[2] While all six wells were spudded during the primary term, two wells were actually completed after the primary term. XOG does not contest the question of whether the actual drilling operations at the expiration of the primary term sufficiently invoked the retained acreage provisions of the assignment agreement.

turns squarely upon the interpretation and construction of the *save and except* provision of Article IX, quoted hereinabove. Specifically, it turns on how the parties intended to define a "proration unit" with respect to each well.

XOG contends the operation of the retained-acreage clause is tied to the regulatory framework of the Texas Railroad Commission. Specifically, it contends the parties intended to retain, with respect to each well, that amount of acreage designated by the operator when it filed a Statement of Productivity of Acreage Assigned to Proration Units (customarily referred to as a Form P-15) with the Texas Railroad Commission. A Form P-15 is the means by which an operator designates the configuration, size, and location of acreage attributable to a given well for purposes of obtaining a production allowable from the Railroad Commission. In accordance with that procedure, in order to obtain regulatory permission to produce from a given well, an operator is required to file a certified plat which distinctly sets out the size and location of the acreage constituting a prescribed proration unit, or fractional proration unit, assigned to that well. Once accepted, the Railroad Commission publishes the size of the specific unit on its proration schedules and issues an allowable authorizing production.

In this case, for purposes of obtaining its production allowables, Chesapeake chose not to designate a full proration unit but instead designated fractional proration units as to each well. On its Form P-15 filings, as to the six wells drilled on the leased acreage in question, Chesapeake assigned production acreage totaling 802 acres. The Form P-15 filed for each well included a certified plat as required by the rules and a designation of the approximate boundaries of each fractional proration unit. In

4

accordance with its practice, the Railroad Commission published a schedule showing the acreage designated by Chesapeake. XOG contends the Form P-15 filings limit the acreage retained to those 802 acres.

On the other hand, Chesapeake contends it was the clear intent of the parties to retain the amount of acreage prescribed by the applicable field rules or, in the absence of any field rules, 320 acres per well. According to its argument, Chesapeake is entitled to retain the full 1,625 acres under lease because, under the facts of this case, its right to retain exceeded the acreage under lease. Specifically, Chesapeake contends the clear and unambiguous language of the agreement defines retained acreage as the area within the surface boundaries of a "proration unit," while further expressly defining a "proration unit" to be "the area within the surface boundaries of the proration unit then *established or prescribed by field rules* or special order of the appropriate regulatory authority for the reservoir in which each well is completed" or, in the absence of such field rules or special order, "each proration unit shall be deemed to be 320 acres." Because the field rules applicable to five wells establish a proration unit to be 320 acres and the proration unit of the sixth well was 320 acres by express agreement of the parties, Chesapeake contends it was entitled to retain up to 1,920 acres (6 wells x 320 acres per well).

### CONTRACT CONSTRUCTION

An oil and gas lease is a contract conveying an interest in real property, as is the assignment of all or a portion thereof. *Petro Pro, Ltd. v. Upland Res., Inc.,* 279 S.W.3d 743, 750 (Tex. App.—Amarillo 2007, pet. denied) (citing *Cherokee Water Co. v. Forderhause,* 641 S.W.2d 522, 525 (Tex. 1982)). As such, the assignment of an oil and

5

gas lease must be construed and interpreted under the same rules of construction as any other contract. *See Tittizer v. Union Gas Corp.,* 171 S.W.3d 857, 860 (Tex. 2005); *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002).

In construing any written contract, the primary concern is to ascertain and give effect to the parties' intentions as expressed within the four corners of that document. *See Frost Nat'l Bank v. L & F Distribs., Ltd*., 165 S.W.3d 310, 311-12 (Tex. 2005) (*per curiam)*. In determining the parties' intent, we consider the entire writing and attempt to harmonize and give effect to all of the contract's provisions. *Id.* at 312. We construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and, when it is appropriate and proper, avoiding any "construction which is unreasonable, inequitable, and oppressive." *Id.* (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). Furthermore, the language in a contract is to be given its plain, ordinary, and generally accepted meaning unless doing so would clearly defeat the parties' intent. *Petro Pro, Ltd.,* 279 S.W.3d at 749 n.3; *Anadarko Petroleum Corp.*, 94 S.W.3d at 554.

If, after such rules are applied, the meaning of the contract remains uncertain or is susceptible to more than one reasonable interpretation, it is ambiguous. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex. 1990). However, if after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning and it is otherwise unambiguous, then we construe it as a matter of law. *Frost Nat'l Bank*, 165 S.W.3d at 312. Whether a contract is ambiguous is a question of law to be determined "by looking at the contract as a whole in light of the circumstances present when the contract was entered," and extrinsic evidence of intent is inadmissible

6

unless the contract is ambiguous on its face. *See Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996). On appeal, we review the trial court's construction of an unambiguous oil and gas lease according to a *de novo* standard of review. *Anadarko Petroleum Corp.*, 94 S.W.3d at 554.

### ANALYSIS

By three issues, all shades and phases of the same argument, XOG contends the trial court misconstrued the intent of the parties concerning what constitutes a "proration unit" for purposes of their agreement. It maintains that under the plain language of this agreement, each drilled well maintained that acreage, and only that acreage, described in the P-15 forms filed with the Railroad Commission. Specifically, XOG contends that, because the trial court did not accept the Railroad Commission filings as being determinative of the intent of the parties, the trial court erred when it granted Chesapeake's motion for summary judgment and denied XOG's motion for summary judgment.

On the other hand, Chesapeake maintains that the plain language of the assignment provides that each well would retain that number of acres prescribed by the Railroad Commission in its special field rules for obtaining the maximum production allowable for a well in that particular field, or that in the absence of any field rules, a deemed acreage of 320 acres. Chesapeake asserts that, because the field rules allowed a proration unit of up to 320 acres for each well in the Allison-Britt field, its five wells in that field were sufficient to retain up to 1,600 acres (5 x 320) encompassed by the assignment. Chesapeake further asserts that, because there are no field rules or special orders applicable to the Stiles Ranch (Granite Wash) Field, its single well in that

7

field was sufficient to hold an additional 320 acres. Because the total potential acreage retained exceeds the actual acreage under lease, Chesapeake maintains the full 1,625 acres covered by the assignment were retained. Accordingly, Chesapeake contends the trial court did not err because it interpreted the intent of the parties in accordance with the plain and ordinary meaning of the precise words and phrases used in the assignment agreement.

We have reviewed the assignment agreement at issue and agree with the parties' stipulation that the retained acreage clause is unambiguous, i.e., that the assignment agreement can be given a definite or certain legal meaning and is otherwise clear and unequivocal. Specifically, we find the parties intended that the acreage excepted from reversion would be that acreage described by the "proration . . . unit of each well." As to the question of what the parties intended when they used that particular phrase, we must ascertain and give effect to the parties' intentions as expressed in four corners of their agreement.

Generally, absent an express contractual agreement providing otherwise, a proration unit is defined as "the acreage assigned to a well for the purpose of assigning allowables and allocating allowable production to the well" for regulatory purposes. 16 TEX. ADMIN. CODE § 3.38(a)(3) (West 2013). For purposes of the Texas Railroad Commission, any unit less than 320 acres is a "fractional proration unit." In this case, the parties specifically agreed to define a proration unit to mean the area within the boundaries of a proration unit "established or prescribed by field rules" or, in the absence of such field rules, 320 acres.

8

In construing an unambiguous oil and gas lease or an assignment thereof, such as the assignment at issue in this case, it is our primary duty to ascertain the objective intent of the parties as expressed words used within the four corners of the lease agreement. *Anadarko Petroleum Corp.*, 94 S.W.3d at 554. In our analysis, we give the language used its plain and grammatical meaning unless doing so would clearly defeat the intentions of the parties. *Id.* In evaluating the intent of the parties, we must examine the entire lease and attempt to harmonize all its parts, even if different parts of the agreement appear contradictory or inconsistent. *Id.* In doing so, we presume the parties to the lease intended every clause to have a purpose, and therefore, we endeavor to give effect to all provisions of the lease so that no provision will be rendered meaningless. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

The "save and except" language contained in the assignment agreement at issue constitutes a limitation of the reversion provisions of that agreement.[3] *See Petro Pro, Ltd.,* 279 S.W.3d at 750. As such, the retainage-clause "retains" the acreage excluded from the automatic termination and reversion provisions of the agreement. In this case, the amount of acreage retained is, by agreement of the parties, the "proration unit" of each well. Where a special limitation or condition provides that an agreement, here an assignment of leases, terminates on the occurrence of that limitation or condition, the agreement automatically terminates upon the happening of the agreed upon limitation or condition. *Rogers v. Ricane Enters., Inc.,* 772 S.W.2d 76, 79 (Tex. 1989). Here, the termination of the assignment was automatically triggered by the termination of the

---

[3] The retained-acreage clause at issue in this case is one of many different types used in the oil and gas industry. Here, the provision for retention of acreage "included within" the proration or pooled unit of each well stands in contrast to clauses that simply specify that the amount of acreage contained in a Form P-15 filing.

9

primary term on May 30, 2005. The retained acreage provisions of Article IX were then put into immediate effect. At that time, according to the express terms of the agreement, all right, title, and interest in the leases reverted to XOG, "save and except that portion of said lease[s] included within the proration or pooled unit of each well drilled."

XOG argues that the "common" practice in the oil and gas industry is to tie the retained acreage clause to the regulatory framework of the Railroad Commission. This argument, however, is of no consequence to the interpretation of an unambiguous agreement. In applying the rules of contract construction, we are not bound by what XOG may perceive to be the industry practice but are instead bound by the actual intent of the parties as expressed by the precise terms of their agreement.

XOG further contends that because the Railroad Commission does not designate the amount of acres or configuration of a proration unit, the definition of proration unit contained in Article IX must refer to the operator's Form P-15 filing since that definition specifically states that the term "proration unit" means "the area within the surface boundaries of the proration unit then established or prescribed by field rules or special order of the [Railroad Commission]." This argument also fails because the field rules do not prescribe the *area* or *boundaries* of a proration unit; they merely set limits on the units designated by producers. Accordingly, the reference to "area" and "boundaries" in the definition of a proration unit does not render meaningless the words used as it pertains to a proration unit prescribed by the applicable field rules. Furthermore, it can be argued that Chesapeake's Form P-15 filings do not define a proration unit for

purposes of Article IX because they only designate "fractional proration units," not "proration units."

XOG next argues that Chesapeake's construction of the assignment agreement attributes no meaning or significance to the "included within" language of the retainage clause. Again, this argument ignores the clear and specific agreement of the parties defining a "proration unit" as the area within the surface boundaries of the unit prescribed by the applicable field rules. To give effect to XOG's argument would mean that we would have to read into the agreement of the parties the intent to "include within" the retained acreage that acreage "designated in the Form P-15 filing as to each well." This we cannot do. The plain language of the agreement defines a "proration unit" (and concomitantly the retained acreage) as the area prescribed by the applicable field rules, or in the absence of field rules, 320 acres—nothing more, nothing less.

Therefore, because the parties expressly agreed that the assignee would retain that portion of a given lease included within a "proration unit" for the Allison-Britt field, the acreage retained by a given well within that field was the standard proration acreage of 320 acres—irrespective of what the operator may have designated in a Form P-15 filing for purposes of obtaining a production allowable for a fractional proration unit. Furthermore, because there were no field rules or special orders applicable to the Stiles Ranch (Granite Wash) Field, by contractual definition, the acreage retained by a given well within that field was 320 acres. Therefore, for purposes of Article IX, given the facts of this case and the agreement of the parties, a "proration unit" was 320 acres.

Because we conclude the parties agreed that Chesapeake would retain 320 acres for each well drilled that was producing or capable of producing gas in paying quantities, we disagree with XOG's construction of the assignment agreement. We conclude that Article IX "retains" or, more correctly, excludes from the automatic termination provisions of the assignment agreement, 320 acres for each well drilled. Because the trial court correctly construed the retained acreage provisions of Article IX of the assignment agreement, it did not err in either granting Chesapeake's motion for summary judgment or denying XOG's motion. Issues one, two, and three are overruled.

**CONCLUSION**

The trial court's judgment is affirmed.


Patrick A. Pirtle
Justice


Campbell, J., dissenting.