

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-16-00022-CV

MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH AND LATIGO PETROLEUM, LLC, APPELLANTS

V.

COURSON OIL & GAS, INC., APPELLEE

On Appeal from the 31st District Court
Roberts County, Texas
Trial Court No. 2060, Honorable Steven R. Emmert, Presiding

October 7, 2016

## OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Appellants, Mayo Foundation for Medical Education and Research and Latigo Petroleum, LLC, appeal the trial court's order granting summary judgment in favor of appellee, Courson Oil & Gas, Inc., and denying appellants' motion for summary judgment. We will affirm.

Factual and Procedural Background

In 1994, Barbara Woodward Lips leased a mineral estate covering approximately 35,000 acres to Alpar Resources, Inc. Subsequently, Courson acquired a 40% working

interest in the lease with Latigo acquiring the remaining 60% working interest. Mayo acquired the reversionary mineral interest from Lips upon her death in 1997.[1]

The central dispute in this case revolves around the construction of the Alpar lease. In essence, Mayo contends that the lease includes an atypical habendum clause that provides different mechanisms for maintaining developed and undeveloped lands. Courson contends that the lease provides for maintenance of the lease on the basis of continuous drilling and, then, a subsequent mechanism for maintaining developed lands after the termination of the lease. As such, we will discuss the specifics of the Alpar lease in the analysis below.

Before trial was held, the parties filed competing motions for summary judgment, each presenting its construction of the Alpar lease. The motions were heard together and the trial court granted Courson's motion and denied Mayo's motion on September 28, 2015. On October 19, 2015, the trial court held a trial on the issue of Courson's attorney's fees.[2] Mayo timely filed the instant appeal.

Mayo's sole issue is whether the Alpar lease provides for automatic termination of individual production units as they cease to produce, regardless of whether the lessee is continuing to drill wells on undeveloped acreage.

Law

An oil and gas lease is a contract conveying an interest in real property and, as such, must be construed and interpreted under the same rules of construction as any

---

[1] As a result of a settlement between Mayo and Latigo, their interests are aligned in this case.

[2] Other than challenging the trial court's summary judgment ruling that made Courson the prevailing party, Mayo does not directly challenge the award of Courson's attorney's fees.

other contract. *XOG Operating, LLC v. Chesapeake Expl. L.P.*, 480 S.W.3d 22, 26 (Tex. App.—Amarillo 2015, pet. filed). Construction of an unambiguous lease is a question of law that is reviewed de novo. *Anadarko Petrol. Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002); *XOG Operating, LLC*, 480 S.W.3d at 27. The Court's primary task in reviewing the lease is to ascertain the parties' intent as expressed in the lease's four corners. *Anadarko Petrol. Corp.,* 94 S.W.3d at 554. In determining the parties' intent, we must presume the parties intended every clause to have a purpose and, therefore, we must strive to give effect to all of the provisions so that none will be rendered meaningless. *XOG Operating, LLC*, 480 S.W.3d at 28.

Traditionally, a mineral lease's habendum clause defines the estate's duration. *Anadarko Petrol. Corp.*, 94 S.W.3d at 554. A typical habendum clause sets a relatively brief period of time for minerals to be located on the property ("primary term"), and then allows the lease to continue so long thereafter as oil, gas, or other minerals are produced. *Id.* Ordinarily, production of oil and gas from any part of leased acreage is sufficient to hold the entirety of the leased property. *See Cmty. Bank of Raymore v. Chesapeake Expl., LLC*, 416 S.W.3d 750, 754 (Tex. App.—El Paso 2013, no pet.). Similarly, retained acreage clauses, such as the production units in the Alpar lease, typically do not take effect until after the continuous drilling or other savings provisions reach their end. *See Chesapeake Expl., LLC v. Energen Res. Corp.*, 445 S.W.3d 878, 886 (Tex. App.—El Paso 2014, no pet.); *Sutton v. SM Energy Co.*, 421 S.W.3d 153, 158-59 (Tex. App.—San Antonio 2013, no pet.).

This appeal turns on competing interpretations of the Alpar lease. Mayo contends that the Alpar lease is not a typical mineral lease because, rather than terminating at the cessation of production in the secondary term, it bifurcates the way that developed and undeveloped land is treated immediately after the end of the primary term. The lease provides that "Lessee may continue this lease in force and effect by continuing to drill one well each 180 days after the primary term," and can "bank time" if it drills wells more often than every 180 days. However, as to developed land, Mayo contends that the lease requires Courson to designate production units and, in order to hold those production units, resume production in paying quantities, drill additional wells, or rework wells within sixty days of the cessation of oil or gas production as to each unit.

By contrast, Courson interprets the Alpar lease as providing that the two mechanisms for holding property under the lease occur sequentially. Courson contends that, after the primary period, the Alpar lease provides for the continuation of the entire lease for so long as Courson drills a well every 180 days or until Courson's banked time credits run out. At that point, the lease expires as to all acreage not then included in a designated production unit. These designated production units can be maintained by Courson if they continue to produce in paying quantities, non-producing wells are reworked, or new wells are drilled within sixty days after the end of profitable production.

## Analysis

The Alpar lease's habendum clause provides that, after the primary term, the lease will continue "so long thereafter as this lease is maintained in force and effect."

4

Mayo contends that the Alpar lease's habendum clause is atypical because it does not provide that the lease may be maintained by production and, as such, "one must look to Paragraph 5(g) [provision addressing production units] to determine the effect of continued production." However, Mayo does not identify the basis for proceeding from the habendum clause to the provision addressing production units to determine the effect of continued production. This is an especially curious omission when other provisions of the Alpar lease directly address the effect of continued production after the primary term and when production units are to be designated and what effect such designations will have.

The 1994 amendment to the lease, which is contained within the preamble to paragraph 5, states that lessee may continue the lease in force and effect by continuously drilling a well every 180 days after the end of the primary term. Specifically, this provision states that, "[i]t was the intent of such lease to provide that after [the] primary term, lessee could continue to develop such lease by drilling a well on the property each 180 days and that the lease would remain effective so long as such drilling by Lessee continued." This language appears to express an intent that the lease continues in force and effect until Lessee fails to develop the land and any banked time credits have expired. Then, paragraph 5(g) provides, "notwithstanding the termination of this lease as to a portion or portions of acreage covered hereby," lessee can designate production units that will "remain in force and effect as to each Production Unit . . . so long as oil or gas is produced from such unit in paying quantities" or "additional drilling or reworking operations are conducted . . . ." These provisions appear to provide that Courson may continue the lease as to all of the covered property by maintaining continuous drilling or accumulating banked time credits and,

5

subsequently, it can hold designated production units that are producing in paying quantities for so long as wells on those units continue to produce, are reworked, or additional wells are drilled on those units.

If, as Mayo contends, the Alpar lease intended to create a distinction in how developed and undeveloped lands are to be maintained, the lease must identify the mechanism by which undeveloped land becomes developed land. The lease does this in paragraph 5(e):

> Lessee shall, *within sixty (60) days <u>after</u> the termination of this lease*, . . . execute and file for record . . . a written recordable instrument designating and describing all of the lands covered by this lease which, upon such termination, are properly included in a Production Unit . . . and *Lessee shall, at such time, further evidence such termination by releasing this lease as to all the lands originally covered hereby not properly included in such unit or units* . . . .

(emphasis added). Clearly, this language provides that production units, or "developed" land under Mayo's dichotomy, shall be designated <u>after</u> the termination of the lease by the cessation of continuous drilling and the expiration of banked time credits. Further, contrary to Mayo's construction, the lease establishes that production units do not come into existence immediately at the end of the primary term. The lease expressly requires, at the time lessee designates production units, the lessee must release all lands other than those that were just included in production units.[3] As such, under this

---

[3] Interestingly, Mayo acknowledges that a typical retained acreage clause is "intended to release from the lease those acreages . . . that have not been developed by the lessee," but distinguishes the Alpar lease on the basis that "the habendum clause does not provide for perpetuation of the entire Lease by production." The Alpar lease's habendum clause does not directly address whether production can perpetuate the lease. However, the Alpar lease does expressly provide that, "Lessee shall, at such time [when production units are designated], further evidence such termination by releasing this lease as to all the lands originally covered hereby not properly included in such unit or units [i.e., the lands not developed during the secondary term]." Thus, the Alpar lease, as with typical leases, expressly intends that undeveloped acreage will be released at the end of the secondary term and at the same time that production units are designated. The interplay of these provisions envisions a secondary term during which production maintains the lease followed by a retained acreage period during which designated production units can be held by continued production.

6

provision, production units and "undeveloped" land cannot exist simultaneously because all lands covered by the lease but not included in production units must be released when the production units are designated.

The lease provides that, if lessee does not designate production units, the lessor can make the designations sixty days after the lessee should have done so. The lease then provides, "such designation, whether made by Lessor or Lessee, shall be effective from the date of termination as above identified." The only "termination" to which this provision could be referring would be the termination of the lease following the continuous drilling period.

Further, the same provision that addresses the procedure for maintaining wells in production units provides that production units are not designated until after the cessation of continuous drilling. In addressing the circumstances where a gas well needs to be redesignated an oil well or vice versa, the lease expressly provides that, "Lessee shall designate a unit or units allocable to such oil [or gas] production, in the same manner provided in the foregoing provisions hereof for development and designation *after the cessation of the successive drilling of wells* as provided in subparagraph (b) of this Paragraph 5 . . ." (emphasis added). Paragraph 5(b) defines how the boundaries of production units are to be determined and designated. The quoted provision clearly contemplates that wells that convert from gas to oil shall be designated in the same manner as production units were designated after the end of continuous drilling and the expiration of banked time credits.

The effect of these provisions are that, during the secondary period, Courson maintains all of the Alpar lease property by drilling a well on the property every 180 days

7

or possessing banked time credits from having drilled wells more frequently than each 180 days. At the end of this secondary period, the lease calls upon Courson to designate production units that are producing in paying quantities, and to simultaneously release all other property under the lease. These production units are then maintained so long as production in paying quantities continues or, if profitable production ceases, the production unit may be maintained by Courson either reworking the existing well or drilling a new well on the unit. We conclude that this is the only reasonable construction that can be given to the Alpar lease.

## Conclusion

When the entire Alpar lease is considered and when each provision contained therein is given meaning, we conclude that the only reasonable construction of the lease is the one offered by Courson. *See XOG Operating, LLC*, 480 S.W.3d at 28. As such, we conclude that the trial court did not err in granting Courson's motion for summary judgment and denying Mayo's motion. We overrule Mayo's sole issue and affirm the judgment of the trial court. *See* TEX. R. APP. P. 43.2(a).

Mackey K. Hancock
Justice

8