**Opinion filed June 29, 2018**



In The

# Eleventh Court of Appeals

_____

## No. 11-16-00199-CV

_____

**GREEHEYCO, INC., Appellant**

**V.**

**R.A. BROWN, JR., AND WIFE, PEGGY DONNELL BROWN, AS CO-TRUSTEES FOR THE R.A. BROWN, JR., TRUST; MERRICK, INC.; DAN C. MORRIS, INDIVIDUALLY AND AS INDEPENDENT EXECUTOR OF THE ESTATE OF ROBERT BROWN MORRIS, DECEASED; SHIRLEY G. CARNEY; BELLE SCOTT MORRIS; CHARLTON MORRIS TRAYNOR; ANN CLOWE JOBE; CHARLES M. CLOWE; BRAD E. CLOWE; AND AMY C. TRAUGHBER, Appellees**

**On Appeal from the 39th District Court**
**Throckmorton County, Texas**
**Trial Court Cause No. 3420**

## O P I N I O N

This is a dispute between the lessors and lessee of an oil and gas lease regarding whether the lease remains in effect. The lessee asserts that its compliance

with the lease's "continuous drilling" clause maintained the existence of the lease.[1] The trial court determined otherwise when it entered summary judgment in favor of the lessors. We reverse and remand.

*Background Facts*

Appellees are the lessors, or the successors in interest to the original lessors, of an oil and gas lease executed on May 30, 2012, in favor of Greeheyco. The parties refer to the lease as the "South Lease." The South Lease covers approximately 3,993 acres in Throckmorton County. Appellees acted through their agent and attorney-in-fact, Joe M. Bellah, in their dealings with Greeheyco.

The original lease contained a primary term of three years as well as a typical habendum clause that would extend the lease into the secondary term so long as oil and gas was being produced. The original lease also contained a "continuous drilling" savings clause that is the subject of this appeal. The continuous drilling clause defined "continuous drilling operations" "as drilling which must be completed to a minimum depth of 1,000 feet."

On June 29, 2015, the parties executed an amendment to the lease. The amendment established the primary term as three years and sixty days measured from the original date of the lease, May 30, 2012. Thus, the lease as amended would have expired on July 29, 2015, unless Greeheyco was producing oil or gas, or otherwise maintained the lease under a savings clause. The amendment also relinquished formations above the top of the "Caddo Formation."[2] However, the

---

[1]Typically, an oil and gas lease is kept alive after its primary term only by production in paying quantities or a savings clause. *See Krabbe v. Anadarko Petroleum Corp.*, 46 S.W.3d 308, 315 (Tex. App.—Amarillo 2001, pet. denied). If the lease's primary term expires when there is non-production and there is no savings clause or the lessee fails to comply with any savings clause in the lease, the lease and the lessee's determinable fee interest automatically terminate. *See id.*

[2]According to the Railroad Commission of Texas website, the Caddo Formation in Throckmorton County begins 1,650 feet below the surface. The deepest depth is approximately 4,450 feet below the surface. Railroad Commission of Texas, SWR #13 Formation Data, http://www.rrc.texas.gov/oil-gas/compliance-enforcement/rule-13-geologic-formation-info (information for District 7B – Throckmorton County).

amendment also provided as follows: "[N]otwithstanding the release of the formations above the Caddo formation[,] a well drilled to a minimum depth of 1,000 feet shall still constitute 'continuous drilling operations' as defined in Paragraph 10. of the Lease."

Prior to the expiration of the amended primary term, Greeheyco's drilling operator, Mantle Oil & Gas LLC, began drilling the "First Brown South Well" on July 15, 2015. Mantle stopped drilling on July 18, 2015, at a depth of 1,050 feet below the surface and released the drilling rig. Mantle's manager, Dwight Chris Barden, stated in his summary judgment affidavit: "We stopped drilling on July 18, 2015 at the depth of 1,050 feet and determined that the First Brown South Well was a dry hole but could be deepened to another potential productive zone or [deepened] to be used as a saltwater injection or disposal well." No further activity was conducted on the South Lease until November.

On November 12, 2015, Mantle began actions to build a location for the "Second Brown South Well." Barden stated that such actions included building a road, "pushing and piling brush, removing vegetation, cutting and leveling the pad, blading and compacting including subgrading the drill site location prior to laying down the base, building a reserve pit and delivered, spread and compacted the base material for the drilling pad." Barden stated that these activities occurred continuously from November 12 to December 4 at a cost of $145,500.

On November 18, Appellees filed the underlying suit against Greeheyco asserting a claim for declaratory judgment and seeking a declaration that the lease had terminated. On December 4, Bellah arrived on the lease with Sheriff Rick Hodges. They ordered Mantle to leave the premises. Mantle complied with this order by removing its equipment from the lease.

Appellees subsequently amended their petition by replacing their declaratory judgment action with a claim for trespass to try title. Appellees alleged that the lease

had terminated and that Greeheyco was interfering with their title through its failure to release the land. In response, Greeheyco asserted a general denial, a specific "not guilty" plea, and affirmative defenses, including estoppel, quasi-estoppel, waiver, ratification, obstruction and repudiation of the lease, and interference with contract and a business relationship.

Appellees moved for summary judgment on both no-evidence and traditional grounds on its trespass to try title claim. Appellees' no-evidence ground asserted that Greeheyco failed to produce "evidence that any oil or gas was being produced from said land on July 29, 2015, or that the lease was otherwise maintained in effect pursuant to its provisions." Appellees' traditional summary judgment ground alleged that there was no genuine issue of material fact that "(i) the primary term of the Subject Lease expired on July 29, 2015; (ii) there was no production of oil or gas from the leased premises at the expiration of the primary term of the Subject Lease; and (iii) no drilling operations were being conducted on the leased premises at the end of the primary term of the Subject Lease."

Appellees attached two affidavits with corresponding exhibits in support of their motion for summary judgment. Greeheyco responded to Appellees' motion for summary judgment by objecting to Appellees' attached summary judgment evidence. Greeheyco also asserted that the continuous drilling clause maintained the lease in existence. Greeheyco provided summary judgment evidence in the form of two affidavits and Bellah's deposition. Appellees objected to Greeheyco's two summary judgment affidavits on the basis that they did not state that the information was "true and within the affiant's personal knowledge." After a hearing, the trial court entered a written order that overruled all objections to the summary judgment evidence and granted Appellees' motion for summary judgment.

In four issues on appeal, Greeheyco contends that the trial court erred (1) by granting Appellees' no-evidence motion for summary judgment, (2) by overruling

4

Greeheyco's objections to a supporting affidavit attached to Appellees' motion, (3) by determining that the terms of the oil and gas lease had been established as a matter of law, and (4) by granting Appellees' traditional motion for summary judgment because material fact questions existed. Appellees have presented two cross-issues on appeal. Appellees contend that the trial court erred in overruling their objections to the supporting affidavits attached to Greeheyco's response. Additionally, Appellees contend that Greeheyco waived any argument that the lease was extended for 120 days. We will address the evidentiary issues before analyzing the merits of the summary judgment.

*Analysis*

*Objections to the Summary Judgment Evidence*

In its second issue, Greeheyco contends that the trial court erred in overruling its objections to Bellah's affidavit because it and the documents attached to it are not competent summary judgment evidence. Additionally, Appellees contend in their first cross-issue that the trial court erred in overruling their objections to Greeheyco's responsive summary judgment evidence because the affidavits offer legal conclusions and do not establish the facts as true or within the affiant's personal knowledge.

Evidence offered in support of or in opposition to a summary judgment motion must be in admissible form to constitute competent summary judgment evidence. *See* TEX. R. CIV. P. 166a(f). In addition, there is no difference between the standards for evidence that would be admissible in a summary judgment proceeding and those applicable at a regular trial. *United Blood Servs. v. Longoria*, 938 S.W.2d 29, 30 (Tex. 1997). We review a trial court's evidentiary ruling under an abuse of discretion standard. *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 727 (Tex. 2016). An abuse of discretion exists only when the court's decision is made without reference to any guiding rules and principles. *U-Haul Int'l, Inc. v. Waldrip*,

380 S.W.3d 118, 132 (Tex. 2012). "An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling." *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

Greeheyco made four evidentiary objections in response to Appellees' summary judgment evidence. Greeheyco's first two objections were directed at an unsigned copy of the lease that was attached as an exhibit to Bellah's affidavit. Greeheyco objected that the unsigned lease was not properly authenticated and was not the "best evidence" of the lease. Greeheyco also asserted that Bellah lacked personal knowledge and that his statements were hearsay to which no exception applied and were unsubstantiated factual conclusions. On appeal, however, Greeheyco's brief focuses only on the "best evidence" objection and an objection under the parol evidence rule. Therefore, we direct our analysis to these contentions.

In his affidavit, Bellah averred that a "true and correct copy" of the lease was attached as Exhibit 1. This exhibit was comprised of three documents: a "Memorandum of Oil and Gas Lease,"[3] an illegible lease that appeared to be signed, and an unsigned copy of the lease. Within Bellah's affidavit, there is no explanation of why the signed copy of the lease attached to the affidavit is indecipherable. During Bellah's deposition, however, Appellees' counsel stated that Appellees did not have a copy of the signed lease because Greeheyco took the original. Subsequently during the deposition, Bellah stated that the original lease was drafted by Greeheyco's landman using a reproduced lease that the landman drafted for a different property.

Greeheyco asserts that the unsigned/unfiled lease that accompanies the illegible lease is "not the best evidence of the content of the oil and gas lease that was actually signed by the owners and Greeheyco." *See* TEX. R. EVID. 1002–1005.

---

[3]Rather than filing an executed copy of the complete lease, the parties filed a "Memorandum of Oil and Gas Lease" in the public records.

Furthermore, Greeheyco asserts that "Bellah's assurances via parol evidence that the two documents accurately state what the documents being interpreted say [are] not satisfactory in a summary judgment proceeding." We disagree.

Unless otherwise provided by the Texas Rules of Evidence, an original writing is required to prove the content of a writing. TEX. R. EVID. 1002. Under Rule 1003, "[a] duplicate is admissible to the same extent as the original unless a question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." TEX. R. EVID. 1003. Furthermore, other evidence may be admissible to prove the content of a writing if the original is in possession of the party against whom it is offered. TEX. R. EVID. 1004(d). Rule 1004(d) states:

> An original is not required and other evidence of the content of a writing, recording, or photograph is admissible if:
>
> . . . .
>
> . . . the party against whom the original would be offered had control of the original; was at that time put on notice, by pleadings or otherwise, that the original would be a subject of proof at the trial or hearing; and fails to produce it at the trial or hearing.

Bellah averred in his affidavit that the unsigned lease attached to his affidavit was a duplicate of the lease the parties executed. *See* TEX. R. EVID. 1003. Greeheyco simply objected that the unsigned lease was not the best evidence of the contents of the signed lease. Greeheyco did not challenge the authenticity of the unsigned lease and did not assert that it would be unfair to admit the unsigned duplicate in place of the original lease. *Id.*; *see Trice v. Colony Builder's, Inc.*, No. 01-01-00501-CV, 2002 WL 164318, at *4 (Tex. App.—Houston [1st Dist.] Jan. 23, 2003, pet. denied) (mem. op.).

Greeheyco also objected to the unsigned lease, on the basis that a copy is not admissible if the original document is not produced, citing *Mercer v. Daoran Corp.*, 676 S.W.2d 580, 584 (Tex. 1984). *Mercer* is distinguishable, however, because

"[t]he absence of the original was never explained." 676 S.W.2d at 584. Appellees offered an explanation for their lack of a legible, executed copy of the original lease. Furthermore, Greeheyco's right to occupy the property emanated from the original lease and Greeheyco quoted from the lease in its response to Appellees' motion for summary judgment by asserting its reliance upon the continuous drilling clause as maintaining the existence of the lease.

The trial court could have reasonably concluded that Greeheyco possessed either the original executed copy of the lease or a duplicate of the executed lease when Appellees' motion for summary judgment put Greeheyco on notice that the contents of the lease would be the subject of proof regarding whether the lease had terminated. Yet, Greeheyco has not produced any document that it contends is the correct signed lease. *See* Tex. R. Evid. 1004(d). Accordingly, the trial court did not abuse its discretion by overruling Greeheyco's objection under the best evidence rule.

Greeheyco also contends on appeal that Bellah's affidavit contains parol evidence that is not proper summary judgment proof. The parol evidence rule is a cornerstone of contract law that establishes that extrinsic evidence is not admissible to vary, add to, or contradict the terms of a written contract that is facially complete and unambiguous. *Gail v. Berry*, 343 S.W.3d 520, 523 (Tex. App.—Eastland 2011, pet. denied). It is a rule of substantive law—evidence that violates the parol evidence rule cannot be given legal effect. *Id.* Bellah's affidavit does not violate the parol evidence rule because it is not an attempt to alter or contradict any part of the lease. Rather, it is an attempt to prove the contents of the lease because Appellees' copy of the lease was illegible. *See Wood v. Pharia L.L.C.*, No. 01-10-00579-CV, 2010 WL 5060621, at *4 (Tex. App.—Houston [1st Dist.] Dec. 9, 2010, no pet.) (mem. op.). We overrule Greeheyco's second issue.

8

In Appellees' first cross-issue, they assert that the trial court erred by overruling their objections to Greeheyco's responsive summary judgment proof. In identical objections, Appellees objected to the affidavits of Dwight Chris Barden and Robert M. Patton as being legally insufficient and improper summary judgment evidence. Appellees asserted that the affidavits were legally insufficient because they did not establish the facts as true or within the affiant's personal knowledge. Additionally, Appellees objected to the affiants' conclusions that Greeheyco had complied with the terms of the lease as being improper legal opinions. The trial court denied both objections.

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." TEX. R. CIV. P. 166a(f); *see Gail*, 343 S.W.3d at 522. The affidavit must be positively and unqualifiedly within the affiant's personal knowledge and represent the facts disclosed to be true. *Humphreys v. Caldwell*, 888 S.W.2d 469, 470 (Tex. 1994). However, an affidavit is not defective for failing to specifically state that the facts within are true and correct. *Fed. Fin. Co. v. Delgado*, 1 S.W.3d 181, 184 (Tex. App.—Corpus Christi 1999, no pet.). When the affiant states that the affidavit is based on personal knowledge, is subscribed, and is sworn to before a notary public, the effect is that the affiant is representing that the facts are true and correct. *Id.* "[A]n affiant's acknowledgement of the sources from which he gathered his knowledge does not violate the personal knowledge requirement." *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 224 (Tex. 2004).

Barden's affidavit states that he is a member/manager of Mantle Oil & Gas, LLC and sets out to establish all the actions that were taken on the property on behalf of Greeheyco. Patton's affidavit states that he is an attorney and experienced principal investor in the oil and gas industry. His affidavit sought to explain the

industry practice of operators listing a total depth that was deeper than intended due to cost-saving reasons. Contrary to Appellees' arguments, both of these affidavits were properly sworn to and state that they are "within [the] personal knowledge" of the affiant. Furthermore, Patton's statement that he reviewed documents does not violate the personal knowledge requirement. We conclude that the trial court did not abuse its discretion in deciding that Barden's and Patton's affidavits adequately demonstrated their personal knowledge.

With respect to Appellees' contention that the affidavits are conclusory, they specifically complain in their brief about the following statement in both affidavits: "Greeheyco, Inc. has complied with the Continuance [sic] Drilling Clause of Paragraph 10 in the Lease, and the Lease would have still been in full force and effect on December 4, 2015 . . . ." Affidavits containing conclusory statements that fail to provide the underlying facts to support the conclusion are not proper summary judgment evidence. *Elizondo v. Krist*, 415 S.W.3d 259, 264 (Tex. 2013); *Gail*, 343 S.W.3d at 523. However, the trial court did not give Greeheyco's affidavits conclusive effect because the trial court granted Appellees' motion for summary judgment. Accordingly, we do not reach Appellees' contention that the trial court erred by not overruling their objection that the affidavits were conclusory. We overrule Appellees' first cross-issue.

*Summary Judgment*

We now address Greeheyco's remaining issues, which derive from the trial court's grant of summary judgment to Appellees. Appellees filed suit alleging a claim for trespass to try title. Appellees then filed a combined traditional and no-evidence motion for summary judgment. The trial court granted the motion on unspecified grounds.

A grant of summary judgment is reviewed de novo on appeal. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 219 (Tex. 2017).

10

When the trial court's order fails to specify the grounds for its summary judgment, we will affirm if any of the theories are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003). "If a party moves for summary judgment on both traditional and no-evidence grounds, as the parties did here, we first consider the no-evidence motion." *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017).

*No-Evidence Motion for Partial Summary Judgment*

In its first issue, Greeheyco contends that a no-evidence motion for summary judgment was not proper because Appellees had the burden of proof on their trespass to try title claim. We agree. Rule 166a(i) permits a party to move for "summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." TEX. R. CIV. P. 166a(i). Therefore, only a party without the burden of proof may move for a no-evidence summary judgment. *See id.*; *Estate of Smith v. Ector Cty. Appraisal Dist.*, 480 S.W.3d 796, 801 (Tex. App.—Eastland 2015, pet. denied).

As indicated by the live pleadings, Appellees sought title to and possession of the mineral estate through a trespass to try title suit. *See* TEX. R. CIV. P. 783. A trespass to try title claim is the statutory vehicle used to determine title to real property. TEX. PROP. CODE ANN. § 22.001(a) (West 2014); *see Teon Mgmt., LLC v. Turquoise Bay Corp.*, 357 S.W.3d 719, 723 (Tex. App.—Eastland 2011, pet. denied). The plaintiff has the burden to establish its title to the disputed property. *See Martin v. Amerman*, 133 S.W.3d 262, 265 (Tex. 2004). "[A] plaintiff [must] prevail on the superiority of his title, not on the weakness of a defendant's title." *Id.*

In Appellees' motion for summary judgment, they asserted that the lease terminated according to its own terms. Within the no-evidence portion of the motion, Appellees asserted, "Defendant has produced no evidence that any oil or gas was being produced from said land on July 29, 2015, or that the lease was otherwise

11

maintained in effect pursuant to its provisions." However, this contention places a burden on Greeheyco to present evidence to rebut a claim upon which it does not have the burden of proof. This is contrary to the procedure for a no-evidence motion for summary judgment. *See* TEX. R. CIV. P. 166a(i).

Appellees rely on *Martin v. McDonnold*[4] for the proposition that "a plea of 'not guilty' in a trespass to try title case does not mean that a 'no evidence' motion for summary judgment cannot be granted in favor of the plaintiff." However, their reliance on *McDonnold* is misplaced. In that case, the plaintiff's no-evidence motion attacked the defendant's affirmative defense of limitations and claim of lease repudiation, which were matters for which the non-movant defendant would have the burden of proof at trial. *McDonnold*, 247 S.W.3d at 228.

Appellees asserted a no-evidence motion for summary judgment against Greeheyco on Appellees' trespass to try title claim. Appellees, as the plaintiffs, have the burden of proof on this claim. As such, they were not entitled to seek a no-evidence summary judgment on that claim. *See Estate of Smith*, 480 S.W.3d at 801; *see also Nowak v. DAS Inv. Corp.*, 110 S.W.3d 677, 680 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("[I]f a party were able to file a no-evidence motion on their own cause of action, it would be tantamount to allowing them to prevail without ever proving the elements of their cause of action."). To the extent that the trial court granted summary judgment on Appellees' no-evidence motion, we sustain Greeheyco's first issue.

*Traditional Motion for Partial Summary Judgment*

Greeheyco's third and fourth issues address Appellees' traditional motion for summary judgment. A party moving for traditional summary judgment bears the burden of proving that there is no genuine issue of material fact as to at least one essential element of the cause of action being asserted and that it is entitled to

---

[4]247 S.W.3d 224, 233–37 (Tex. App.—El Paso 2006, no pet.).

judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017). If the movant initially establishes a right to summary judgment on the issues expressly presented in the motion, then the burden shifts to the nonmovant to present to the trial court any issues or evidence that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979). When reviewing a traditional motion for summary judgment, we review the evidence in the light most favorable to the nonmovant, indulge every reasonable inference in favor of the nonmovant, and resolve any doubts against the motion. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005).

In its third issue, Greeheyco contends that there is a fact question regarding the terms of the lease. Specifically, Greeheyco asserts that Bellah's affidavit, which avers that the language in the unsigned/unfiled lease matches the language in the signed/illegible lease, does not conclusively establish the terms of the lease because Bellah is an interested witness. We disagree.

"A summary judgment may be based on uncontroverted testimonial evidence of an interested witness . . . if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." TEX. R. CIV. P. 166a(c). Bellah's testimony was clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and readily could have been controverted. Furthermore, Greeheyco offered no controverting evidence concerning the terms of the original lease. To the contrary, the language of the continuous drilling clause cited by Greeheyco in its response to the motion for summary judgment is identical to the language in the unsigned lease attached to Bellah's affidavit. An affidavit may be "readily controverted" if it can be effectively countered by opposing evidence as opposed to a mere rebuttal. *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989); *see also First*

13

*Nat'l Bank in Munday v. Lubbock Feeders, L.P.*, 183 S.W.3d 875, 882 (Tex. App.—Eastland 2006, pet. denied). Thus, even if Bellah was an interested witness, the trial court was entitled to conclude that his affidavit and the attachments to it established the terms of the original lease. *See William Marsh Rice Univ. v. Refaey*, 495 S.W.3d 531, 537–38 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). We overrule Greeheyco's third issue.

In its fourth issue, Greeheyco contends that there are genuine issues of material fact regarding whether the lease has expired. Greeheyco contends that the affidavits it submitted established that there are material fact questions that preclude summary judgment. We agree.

Appellees asserted that the continuous drilling clause did not perpetuate the lease beyond July 29, 2015, for the following reasons: (1) Greeheyco was not engaged in drilling for oil or gas at the end of the primary term; (2) the First Brown South Well was insufficient to invoke the continuous drilling clause; and (3) more than 120 days elapsed before the Second Brown South Well was actually drilled. There is no dispute that the primary term of the lease (as amended) expired on July 29, 2015, that production was not occurring on that date, and that Greeheyco was not engaged in drilling on that date. Accordingly, there are two questions presented for this court's consideration: (1) the effect of the First Brown South Well with respect to the continuous drilling clause and (2) the effect of Greeheyco's efforts beginning on November 12 to prepare for drilling the Second Brown South Well. Both of these questions require an interpretation of the lease and the amendment to the lease.

"An oil and gas lease is a contract, and its terms are interpreted as such." *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005). We review and construe mineral leases de novo, and this court's objective in doing so is to ascertain the parties' intent as expressed within the lease's four corners. *Endeavor Energy*

*Res., L.P. v. Discovery Operating, Inc.*, No. 15-0155, 2018 WL 1770290, at \*3 (Tex. Apr. 13, 2018) (citing *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002)). In construing an oil and gas lease, we seek to enforce the intention of the parties as expressed in the lease. *Tittizer*, 171 S.W.3d at 860. "As with contracts generally, the parties are free to decide their contract's terms, and the law's 'strong public policy favoring freedom of contract' compels courts to 'respect and enforce' the terms on which the parties have agreed." *Endeavor*, 2018 WL 1770290, at \*3 (quoting *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016)).

> The lease's continuous drilling clause provided as follows:

> If at the expiration of the Primary Term of this Lease, oil or gas are not being produced on the Leased Premises or on lands pooled therewith, but the Lessee is then engaged in drilling for oil or gas, or has within the last 120 days prior to the end of the primary term completed a well as productive or a Dry Hole, then this Lease shall continue in force so long as drilling operations are being continuously prosecuted on the Lease Premises or on lands pooled therewith; and drilling operations shall be considered to be continuously prosecuted if not more than one hundred twenty (120) days shall elapse between the cessation of drilling operations of one well to its total depth and the beginning of operations for the drilling of a subsequent well. For the purpose of this Lease, this shall be known as "continuous drilling operations" and defined as drilling which must be completed to a minimum depth of 1,000 feet following within no more than one hundred twenty (120) days after cessation of drilling operations from the previous well to its total depth on the Leased Premises. If oil or gas shall be discovered and produced from any such well or wells drilled or being drilled at or after the expirations of the Primary Term of this Lease, this Lease shall continue in force so long as oil or gas shall be produced from the Leased Premises pursuant to the provisions hereof.

The amendment to the lease provided in relevant part as follows:

> Lessee relinquishes, releases and surrenders to the Successor Lessors the formations above the top of the Caddo Formation, preserving however, the right to explore, penetrate, drill, complete and produce through such formations in an effort to explore, develop and produce from all formations below such point. It is provided however, that

15

notwithstanding the release of the formations above the Caddo formation a well drilled to a minimum depth of 1,000 feet shall still constitute "continuous drilling operations" as defined in in Paragraph 10. of the Lease.

The amendment also provided that its terms superseded any conflicting terms in the original lease.

*The Effect of the First Brown South Well*

Appellees initially assert that the drilling of the First Brown South Well was ineffective to trigger the continuous drilling clause. They base this assertion on the contention that the well was not completed as either a producing well or a dry hole. Appellees asserted as follows in their motion for summary judgment with respect to the First Brown South Well: "[Greeheyco] did not complete a productive well, nor did it drill to the permitted total depth and complete a well as a dry hole. All that [Greeheyco] did was drill a hole to 1,050 feet, stop, and move off the location."

Appellees' contention is premised on their interpretation of the lease. The "operative" portion of the continuous drilling provision reads as follows:

> If . . . the Lessee . . . has within the last 120 days prior to the end of the primary term completed a well as productive or a Dry Hole, then this Lease shall continue in force so long as drilling operations are being continuously prosecuted on the Lease Premises or on lands pooled therewith; and drilling operations shall be considered to be continuously prosecuted if not more than one hundred twenty (120) days shall elapse between the cessation of drilling operations of one well to its total depth and the beginning of operations for the drilling of a subsequent well.[5]

This operative portion was immediately followed by this definition:

> For the purpose of this Lease, this shall be known as "continuous drilling operations" and defined as drilling which must be completed to a minimum depth of 1,000 feet following within no more than one

---

[5]For identification purposes, we will refer to this portion of the continuous drill clause as the "operative portion."

16

hundred twenty (120) days after cessation of drilling operations from the previous well to its total depth on the Leased Premises.[6]

The parties disagree over the portions of the continuous drilling clause to which this definition applies. Appellees assert that, as a matter of law, the definition only applies to the second well (the well to be drilled within 120 days after the first well) and not the first well (the well drilled within 120 days prior to the expiration of the primary term). We disagree.

With respect to the first well, the operative portion of the continuous drilling clause requires that it has to be drilled to its total depth within 120 days prior to the expiration of the primary term in order to invoke the continuous drilling clause. Thus, the date that the first well is drilled to its total depth triggers the beginning of the 120-day period for the second well. Appellees place an emphasis on the phrase "total depth" concerning the first well. As noted previously, Appellees contend that that the minimum depth of 1,000 feet set out in the definition does not apply to the first well. Appellees cite *Modern Expl., Inc. v. Maddison*, 708 S.W.2d 872, 876 (Tex. App.—Corpus Christi 1986, no writ), for the proposition that "total depth" means the depth at which oil or gas has been reached for a producing well. For a dry hole, Appellees assert that "total depth" means the "planned total depth" listed on the Commission's drilling permit. Based upon these interpretations, Appellees assert that the First Brown South Well is simply "a hole in the ground" that does not invoke the continuous drilling clause.

We interpret technical words and phrases according to the understanding of the business individuals who use them—absent evidence that a different interpretation was intended. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 211 (Tex. 2011). In this instance, the continuous drilling clause

---

[6]For identification purposes, we will refer to this portion of the continuous drill clause as the "definition portion."

provides a definition agreed to by the parties. The definition does not specify that it only applies to the second well. To the contrary, the express language of the definition specifies that the minimum depth of 1,000 feet applies to the first well because it indicates that drilling a well to this minimum depth triggers the "following" 120-day period for the second well "after cessation of drilling from the previous well to its total depth." Furthermore, a leading oil and gas commentary defines "total depth" as simply "the greatest depth reached by a well bore." 8 Patrick H. Martin & Bruce M. Kramer, Williams & Meyers, *Oil and Gas Law: Manual of Oil and Gas Terms* 1084 (LexisNexis Matthew Bender 2017). If this definition of total depth is applied to the First Brown South Well, its total depth was 1,050 feet, which exceeds the minimum drilling depth of 1,000 feet specified by the lease.

Appellees assert that Greeheyco's act of drilling the First Brown South Well to only 1,050 feet should be ineffective to invoke the continuous drilling clause because that was an insufficient depth to reach the Caddo formation and because all formations existing above the Caddo formation were released by the lease amendment. However, the lease amendment specifically provided that "notwithstanding the release of the formations above the Caddo formation a well drilled to a minimum depth of 1,000 feet shall still constitute 'continuous drilling operations' as defined in Paragraph 10. of the Lease."

When parties use the phrase "notwithstanding" in a contract, they contemplate the possibility that other parts of their contract may conflict with that provision and they agree that the "notwithstanding" provision must be given effect regardless of any contrary provisions of the contract. *See Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 643 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *see also Horseshoe Bay Resort, Ltd. v. CRVI CDP Portfolio, LLC*, 415 S.W.3d 370, 384 (Tex. App.—Eastland 2013, no pet.) (noting that "notwithstanding" signals "superordinating language"). Thus, the lease amendment specifies that drilling to a

minimum depth of 1,000 feet constitutes continuous drilling operations even though formations lying at that depth were released by the lease amendment. Additionally, the lease amendment clarifies that drilling to a minimum depth of 1,000 feet satisfies the continuous drilling clause. Accordingly, the drilling of the First Brown South Well to a depth in excess of 1,000 feet less than 120 days prior to the expiration of the amended primary term was sufficient to raise a fact question that Greeheyco's actions triggered the start of the continuous drilling clause.

*Preparations for Drilling the Second Brown South Well*

Mantle stopped drilling the First Brown South Well on July 18. Appellees assert that, as a matter of law, the continuous drilling provision does not extend the lease because Greeheyco did not drill a subsequent well to at least a depth of 1,000 feet by November 15, which is the 120th day after July 18. Appellees base this contention on the argument that the definition's reference to a minimum depth of 1,000 feet applies to the second well such that it had to be drilled to 1,000 feet by the 120th day after drilling ceased on the first well.[7] Conversely, Greeheyco contends that its actions starting on November 13 to prepare a well site for the Second Brown South Well were sufficient to satisfy the continuous drilling clause. In making this assertion, Greeheyco asserts that that the minimum depth of 1,000 feet set out in the definition does not have to be satisfied within the 120-day period with respect to the second well. Thus, the parties' remaining dispute focuses on whether the definition applies to the requirements for the second well to be completed within the 120-day period following the first well.

The operative portion of the continuous drilling clause provides that the lease is extended if "not more than one hundred twenty (120) days shall elapse between

---

[7]Appellees assert in their second cross-issue that Greeheyco waived its argument that the lease was extended under the continuous drilling operations clause because it did not assert in the trial court that it drilled the Second Brown South Well to 1,000 feet by November 15. Thus, Appellees' waiver argument is based on their construction of the continuous drilling clause with respect to the second well.

the cessation of drilling operations of one well to its total depth and *the beginning of operations for the drilling of a subsequent well*" (emphasis added). This italicized language specifies that the beginning of operations for the drilling of a subsequent well is all that is required to occur within 120 days after the drilling of the first well ceases. If the definition's minimum depth requirement of 1,000 feet is applied to the requirements for the second well, the phrase "*the beginning of operations for the drilling of a subsequent well*" in the operative portion of the continuous drilling clause would be rendered meaningless. In construing a contract, "we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). Accordingly, the terms of the continuous drilling clause do not conclusively establish that the minimum depth of 1,000 must be reached within the 120-day period with respect to the second well.

This construction of the continuous drilling clause comports with the usual wording of a continuous drilling clause. *See* 3 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law* § 617.2 (LexisNexis Matthew Bender 2017) (citing examples of continuous drilling clauses).

Greeheyco's summary judgment evidence established that three days before the 120-day term was to end, Greeheyco began building a road and constructing the drill location for the Second Brown South Well. Those preliminary operations were ongoing until December 4 when Greeheyco was ordered to leave. Greeheyco contends that this summary judgment evidence was sufficient to raise a fact question that it timely began operations for the drilling of a subsequent well. We agree. *See Rippy Interests, LLC v. Nash*, 475 S.W.3d 353, 361 (Tex. App.—Waco 2014, pet. denied); *Valence Operating Co. v. Anadarko Petroleum Corp.*, 303 S.W.3d 435, 440 (Tex. App.—Texarkana 2010, no pet.); *Phillips v. Sunex Oil & Gas Co.*, 419 S.W.2d

422, 427 (Tex. App.—Amarillo 1967, writ ref'd n.r.e.); *Whelan v. R. Lacy, Inc.*, 251 S.W.2d 175 (Tex. App.—Texarkana 1952, writ ref'd n.r.e.).  As noted in *Valence Operating*, "[a]ctual drilling is not necessary in order to comply with an obligation to commence operations for drilling as required by contractual provisions in many oil and gas leases and joint operating agreements."  303 S.W.3d at 440.  "Preparatory activities such as building access roads to the drill site, moving tools and equipment onto the drill site, providing a water supply, and similar activities are usually sufficient if they are performed with the bona fide intention to proceed with diligence to the completion of the well." *Id.*  We sustain Greeheyco's fourth issue and overrule Appellees' second cross-issue.

### This Court's Ruling

We are not to be taken to hold that the 1,000 foot requirement would never apply to the second well.  We simply hold that, here, Appellees did not conclusively establish their entitlement to summary judgment.  Therefore, we reverse the judgment of the trial court, and we remand the cause for further proceedings consistent with this opinion.


JOHN M. BAILEY
JUSTICE


June 29, 2018

Panel consists of: Willson, J.,
Bailey, J., and Wright, S.C.J.[8]

---

[8]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.